Haley v. Goodheart.

---

## JEREMIAH L. HALEY

### *v.*

## FANNIE GOODHEART et al.

[Filed September 15th, 1899.]

1. The act (*P. L. of 1896 ch. 167*, amended by *P. L. of 1897 ch. 117*) entitled "An act to compel the determination of claims to estates in remainder in certain cases and to quiet the title to the same" is constitutional.

2. In a suit to determine complainant's claim to an estate in remainder in his grandfather's estate and to quiet title thereto, the question of his legitimacy arose.—*Held*, upon the facts established in this case that the relation between the father and mother of complainant was illicit, and that complainant could not maintain the suit.

On final hearing.

*Mr. Harry E. Richards*, for the complainant.

*Mr. Walter Collins* and *Mr. Gilbert Collins*, for the defendants.

STEVENS, V. C.

This is a suit brought under the act of 1896 to compel the determination of claims to estates in remainder and to quiet the title to the same.   *P. L. of 1896 p. 243; P. L. of 1897 p. 211.* The act as amended is nearly a copy of the act to quiet titles. *Gen. Stat. p. 3486.*   It provides in substance that when any person claims to be entitled to a vested remainder in lands or personalty and his title is denied or disputed, he may maintain a suit in chancery to settle the title and to clear up all doubts and disputes concerning the same.   It did not, as does the act to quiet titles, provide for an issue at law on the application of either party.   In 1897 this defect was remedied, and counsel on both sides being desirous that any question relating to the jurisdiction should as far as possible be eliminated, it was stipulated that the case should be deemed to have been brought under the act as amended.   I think that the act as it now stands rests substantially upon the same foundation as the act to quiet titles. The latter act confers jurisdiction in cases over which, before its passage, equity did not take jurisdiction.   *Story Eq. Jur.* § *852; Pom. Eq. Jur.* § *1396.*   Mr. Justice Depue, in *American Dock Co.* v. *Trustees, 10 Stew. Eq. 272,* says: "It enlarged the jurisdiction of the court of chancery in this respect.   It gave a party who is in peaceable possession of lands, where his title is disputed, a right to come into chancery to settle the title, in advance of a determination of the title at law, where no suit to enforce or test the validity of the title is pending." The same judge says, in *Sheppard* v. *Nixon, 16 Stew. Eq. 631:* "The foundation of the jurisdiction is the inability of the complainant to obtain relief by an action at law or the inadequacy of the legal remedy."   "The purpose of the act," said Chief-Justice Beasley in *Jersey City* v. *Lembeck 4 Stew. Eq. 255,* "is

to relieve, not persons who had the power to test the hostile claim by a direct proceeding in the usual mode, but to aid those persons who had no such opportunity." See, also, *Yard* v. *Ocean Beach, 4 Dick. Ch. Rep. 306; Southmayd* v. *City of Elizabeth, 2 Stew. Eq. 203, 650.*

These authoritative cases show that it is within the competence of the legislature to confer upon the court of chancery jurisdiction to determine legal questions, in cases so circumstanced that no relief can be given by action at law, at least, and this is as far as it is necessary for me to go in the present case, where it is provided that, on application of either party, an issue at law shall be directed. For if the legislature has the power to thus provide in one class of cases, it must have power to so provide in other classes of cases similarly situated—cases in which there is a similar inability to obtain relief in an action of law. The class of cases provided for in the act of 1896 is characterized by this inability and the case in hand is a strong illustration of its utility. I think that the authorities which sustain the constitutionality of the act to quiet titles are authorities in favor of the constitutionality of the present enactment. I therefore proceed to an examination of the case on its merits.

Jeremiah Haley died on July 3d, 1867, leaving him surviving his widow, Maria Haley, and an only child, Jeremiah. By his will made June 28th, 1867, he gave the residue of his estate to his wife for life or so long as she should remain his widow, subject to an annuity of $1,200, which he gave to his son, Jeremiah, and at her death or remarriage to his son for life with remainder to his issue. In default of issue the son had a power of appointment, and in default of appointment he gave the residue to his brother and sisters, or their representatives. He constituted his wife his executrix. The estate given consisted largely of real estate. Jeremiah, testator's son, was born in 1841, and died on September 20th, 1873. The complainant's claim is that he is the legitimate son of this son, and that, therefore, under the will of his grandfather, he is entitled to the residuary estate subject to his grandmother's life interest. The sole question is whether his claim to legitimacy is well founded.

As testator, testator's son and the present claimant are all called Jeremiah, I will, for the sake of clearness, only so designate testator's son.

Complainant's mother is Mary Lavinia Vreeland. She was born August 22d, 1850, and it is claimed that Jeremiah married her in August or September, 1866. The claimant was born March 21st, 1871, about three years and a half before Jeremiah's death. There is no doubt whatever that between 1866 and 1873 Jeremiah and Lavinia cohabited to some extent, and the question is whether this cohabitation was matrimonial or illicit. I have a strong conviction that it was illicit, notwithstanding the direct evidence of Lavinia to the contrary.

For the sake of clearness, I will consider, first, the life and character of Jeremiah and Lavinia before the alleged marriage; second, the story of the marriage; third, the life of the parties and their conduct from that time on to Jeremiah's death; and fourth, the conduct of Lavinia after that time.

And, *first*, as to their life and character before the alleged marriage in 1866. Jeremiah, or Jerry, as he is called in the evidence, was the son of a fruit dealer, who lived in Essex street, Jersey City, and who had accumulated a considerable fortune. After he left school he appears to have been allowed to live in idleness—whether on account of his health or because of misjudged affection does not clearly appear. It does, however, appear very clearly that the son soon became dissipated. He was a frequenter of saloons and disreputable resorts, and was occasionally found in a condition of intoxication. His comrades were of the same character. One of the witnesses characterizes him as a gentlemanly loafer. In 1866 he was twenty-five years old.

Lavinia Vreeland was the daughter of Nicholas D. Vreeland, a man of respectable family, but of no property. In 1866 she lived with her father and mother in what was then known as Bergen, now a part of Jersey City. Nicholas had three daughters—Kate, Jennie and complainant's mother. The decided weight of the evidence is that in the year 1866, or about that time, Lavinia and Jennie were regarded by the police au-

thorities as somewhat fast. There does not seem to be any doubt but that Lavinia occasionally visited the plumber shop of O'Connor & Pierson, a place resorted to by loose women, and that Pierson enjoyed an unenviable reputation for consorting with them. It is proper to say, however, that there is no other proof of Lavinia's misconduct at this period than that which I have referred to. She does not appear to have attended school or to have had any occupation. In the early part of 1866 she was engaged to a respectable young man by the name of Smith. While so engaged, Pierson brought Jerry to her house, when called there, it is said, to do some plumbing work, and introduced him to her. Jerry seems to have been attracted by her beauty, and thereafter visited her frequently, and on several occasions took her out riding in his father's carriage. This was so displeasing to Smith that he broke off the engagement. In 1866 she was sixteen years old.

*Second.* Lavinia gives the following account of their marriage, which, she says, occurred either in August or September, 1866, and just after her sixteenth birthday :

"Well he came up and wanted to take me out riding and he asked my father and mother if they would allow me to go, and they passed the remark, 'if he would bring me back as he took me away,' and he said 'Yes.' Well we drove to Paterson, and when we were going there he said Baby I am going to get married; you and I are going to get married. But I had no idea we were going to get married at the time. It was in the afternoon (when we left home). It was toward dusk when we arrived in Paterson. My husband stopped at the hotel and went in and got a drink, I presume. I didn't get out of the carriage, and he asked the gentleman there if he knew where there was a clergyman. We called at his house—to the—well I suppose it was the minister. He knocked at the door; the young lady was in the house. He asked if the gentleman of the house was in and she told us to walk in the parlor. Then the gentleman came in and my husband told him that we wanted to get married. He told us to stand up. * * * He asked me if I was willing to take that man as my husband. I said yes, and he asked him if he was willing to take me as his wife and he said yes."

She then says that after leaving the minister's house they went to a hotel in Paterson and stayed there one or two days, and that they then drove back to her mother's. That when she reached her mother's house

Haley *v.* Goodheart.

"my husband told me—I says to my husband, 'I will get killed when I go in,' and he says, 'No you won't; I will see that is all right,'' but he said, 'You had better go in the house.' I said, 'No I won't.' My sister was there and she said, 'You will get it when you come in the house,' and Jerry said, 'No you won't; this is my wife.''

She then testifies that her husband went into the house, but that she did not get out of the carriage; that her mother came out and "she says to me, 'Lavinia, as you have made your bed, you will lie.' My husband said, 'I will take care of her as long as she lives.''"

This story, so far as it relates to what occurred at the house, is corroborated by Jennie Winters, Lavinia's sister, except that Mrs. Winters says that they were gone for a few days instead of a day or two. Although then only fourteen years old, she too, after a period of over thirty years, remembers the very peculiar words attributed by her to her father, "Jerry, bring her back as you took her."

On cross-examination Lavinia could not remember who the driver of the carriage was, although on all previous occasions she remembered that it had been "Larry," Jerry's father's coachman. She could not remember the name of the hotel or anything about it, except that it was "a kind of an old-fashioned place"—an expression by which she also characterized the minister's house. She never saw the marriage certificate; she could not tell what the minister's name was or to what denomination he belonged. It does not appear from her statement that when the minister was told by Jerry she was seventeen it elicited any remark or caused the minister to hesitate, although the statute then forbade the marriage of females under eighteen without the parent's or guardian's certificate. *Nix. Dig. (ed. 1861) 501.* Although after Jerry's death, and probably before, she was poor and destitute, and it was of vital importance to herself and her son that she should have some evidence of the marriage, she has never taken the trouble to go to Paterson to identify the hotel or to ascertain the name of the minister or to look into the record of marriages in the clerk's office.

Her statement of what her father said to Jerry as they were

about to drive off is worthy of remark. " They [her parents] passed the remark," she says, " if he would bring me back as he took me away." If Mr. Vreeland, presumably a respectable man, knew Jerry as he was, he would hardly have permitted his daughter, inclined to be fast, to go off with him. If he did not—if he only knew him as the son of the prosperous fruit-dealer, and this is Lavinia's view—then it is difficult to believe that he would have insulted him and his own daughter, in his presence, with the implication that Jerry might, if permitted to take her out riding, ruin her. But it is just such a remark as Lavinia and her sister Jennie—both of them somewhat lax in their view of the marriage relationship—would be likely to put in his mouth to add color to their story.

There was not the slightest necessity for this runaway match. If Lavinia Vreeland was the pretty, modest girl which it is said she was at this period, there was every reason why Jerry's father and mother should have looked with favor upon a marriage which might have sobered him. That the parents of Lavinia would not have been likely to oppose it appears from the circumstance that they allowed Jerry to visit her and even to drive with her, and from Lavinia's own testimony that they had no objection to it.

This, however, is mere criticism of evidence which the court would not, probably, be at liberty to disregard if there was no further proof of its falsity. But other circumstances appear which seem to me to be absolutely inconsistent with the idea of marriage. It is, indeed, more than probable that their connection did begin by Jerry's taking Lavinia from her home for several days, and upon some such foundation it is probable that the story of the marriage has been built up. If Jerry, without having married her, brought her back after an absence of one or more days, there would be some point to the remark said to have been made by her mother, " Lavinia, as you have made your bed, you will lie."

*Third.* We now come to the life led by Jerry and Lavinia after Lavinia left her home. They went, first, to the Girard House, in New York City, where they stayed for a week or

two; then to a saloon on Bleeker street, where, on one occasion, she was seen by one of the witnesses to be performing the duties of a bar-maid; then, after a short time, to Bedford street. In Bedford street, in the spring of 1867, she gave birth to a child, prematurely born. Then she went for a short time to her mother's, in Jersey City; then to Bloomfield street, Hoboken; then to 163 Grand street, Jersey City; then to a saloon in Hudson street, Hoboken; then to Grove street, Jersey City; then to Horatio street, New York, where she was living when Jerry died. There were other places to which she also went for short periods, but the above are the principal ones. She says that during all this time, except when Jerry was traveling on account of his health, they lived together in the open and avowed relation of husband and wife. To review the evidence in detail upon this part of the case would be both tedious and unnecessary. One thing clearly appears from the testimony, and that is, that, during the entire period from August, 1866, to September, 1873, Jerry lived at his mother's home in Essex street, Jersey City, and no one of his mother's family or relations now living had the slightest suspicion that he was married or even that Lavinia was his mistress. Many respectable witnesses testify that while, at times, he did not return at night, he generally slept and took his meals at home. That he did spend a part of his time with Lavinia, and that he did, for a considerable part of the period named, support her is beyond question. The witnesses who testify in a general way that Jerry openly lived with Lavinia as her husband were casual visitors. No shopkeepers are produced, and, although Lavinia boarded or lodged with many different persons, only one of them is called, viz., Mary Taylor, her aunt. The evidence of this witness is particularly significant. She says that Lavinia boarded with her from May, 1870, to February, 1871, four weeks before complainant was born. She says, further, that Jerry didn't board with her, but that he roomed with Lavinia; that he paid for her $6 a week, which included her meals and room and his occupation of it; that he didn't come there every day; that he was like a flea jumping around, and that "he came three or

four times a week—maybe oftener when he felt like it." In another place she says, "Some weeks he came every day and sometimes once a week; some weeks only two or three times a week." Taking all the evidence together, it is reasonably certain that Jerry slept sometimes at his mother's house and sometimes with Lavinia, and that he generally took his meals at his mother's. I do not think that, on this state of the proofs, the complainant shows a connection apparently matrimonial.

Counsel for the defendant laid great stress upon the evidence of those witnesses who testified that Jerry introduced Lavinia as his wife. Eleven witnesses so stated. Some of them testify to an introduction in a saloon, others to an introduction at a firemen's or other ball. Now, the value of such evidence depends upon the words used, the tone or manner of the speaker and the circumstances under which they were spoken. After a lapse of thirty years, it is difficult to believe that, in the case of a mere casual introduction, any witness could be sure that the expression was, for instance, "My wife, Mrs. Haley." Again, in order to obtain admittance to a ball or gathering not openly disreputable, Jerry would have been obliged to throw over his relationship an appearance of respectability. It is even conceivable that he might have called Lavinia Mrs. Haley, for the purpose, as the witness Loweree intimated, of keeping others at a distance. To the evidence of one or two of these witnesses, notably to that of William H. Smith, to whom Lavinia was engaged, most of these criticisms are not fairly applicable. But assuming that Jerry made the statement to Smith, in the form in which Smith now remembers it, it is quite possible, considering his character, that he might have done so with a view of misleading one whom he might still have feared as a possible rival. On the whole the evidence is entitled to some consideration, but in view of the great lapse of time and of the circumstances under which most of the declarations were made, it is not entitled to the same degree of consideration that might otherwise be given to it.

The evidence of David Hunt, one of Jerry's companions, is very significant. He testifies that he saw Lavinia in the saloon

in Bleecker street in 1868 (an error, probably, in date); that she was around the bar-room; that she talked with the men and drank beer with them and passed beer around the counter. It is hardly supposable that Jerry would have allowed a wife thus to act. Hunt also testifies that on another occasion, while she was living in Hoboken, he and Jerry had been out together and Jerry invited him " to go and put up with Pig " (the name, he says, by which she was sometimes called); that they went to her room; that Jerry and she slept in the bed together, and that he slept on a lounge in the same room; that in the morning he sent her down stairs, and while she was gone he told witness to jump into her bed, which he did, and then, he continues, " when she came up she got in bed where I was, and I began to laugh and set him a laughing, so then she got out and changed places back again." There is nothing in the evidence which indicates that Jerry had then sunk so low that he would have acted thus to one for whom he entertained any respect, and the evidence is all the stronger for the reason that these occurrences took place in the earlier years of their connection. I see no reason for doubting these statements, more particularly as Lavinia herself has not seen fit to contradict them.

It is hard to reconcile her many removals from one house to another; the meagre provision made for her support; her perfect apparent contentment with her questionable position with any rational theory of marriage. She was partial to balls, parties and boating excursions. She says she knew Jerry's father to be a man of large means. I cannot conceive how, with such tastes and with such knowledge of Jerry's ability to give her a much greater degree of comfort and a much higher social position, she did not at least ask him to do so, and yet she says she did not. Even if she had not desired it for her own sake, she would have desired it for her boy's. Her conduct, in this regard, was more in keeping with the position of mistress than of wife.

She says, in her evidence, that they tried to keep the marriage quiet; that " she didn't go round to any of Haley's people after she had him; " that " she didn't ask Jerry to take her to his

family," and that she don't know why she didn't. And yet, on the other hand, she says that her parents were very willing to have her marry Haley, and knew of her marriage within a day or two after it occurred. She even asserts that Jerry went to his father's place of business and introduced her to him as his wife—an assertion which, in view of her cross-examination and the inherent improbability of her story, cannot be credited. She likewise says that the marriage was known to some now deceased members of the Haley family whom she names, but she admits that this knowledge was confined to the "boys"—that is, to Jerry's wild associates. His mother says, and Jerry knew, that nothing would have have been more acceptable than his marriage to a respectable girl. Now, it is true that marriages are sometimes kept secret, even for years, but there is usually some motive for it. Here there was absolutely none.

Another striking circumstance in this case is the absence of correspondence between the parties when Jerry was traveling for his health. In 1870, if not before, he was attacked by consumption, a disease of which, three years later, he died. In May of that year he went to Europe and remained away till August. He subsequently went to California, and in the fall of 1872 to Florida, where he remained about six months. After his return from Florida, Lavinia admits that she never saw him. He died in September, 1873. While on these trips she never wrote to him, and she says that he never wrote to her, except on one occasion, when in Europe in 1870, and then not directly but through George Haley. He was a man of some education, and his failure to write is inexplicable. She does not pretend that they ever quarreled or became estranged, and she does not offer the least explanation of his neglect in this particular. One would have imagined that he would at least have inquired after the boy who bore his name. According to the evidence, he was not a cold, unfeeling profligate. He was kind and affectionate—attentive to his mother and liked by his family.

There is another patent and admitted fact in the case. For a year prior to Jerry's death there was absolutely no communication between the parties. Now, that is very strange. It looks

as if the connection between the parties might have terminated. Jerry was in an advanced stage of consumption. He had frequent hemorrhages. Then, if ever, he needed the loving care of a faithful wife. Lavinia knew that he was sick. There was nothing, if her story be true, to have kept them apart. Why did he not call her to him? Why did she not go of her own accord? Why did she not accompany him to Florida, instead of a comparative stranger? Why, on his return from Florida, when she found that he did not visit her, did she not try to see him and offer to nurse him? Why did she not seek to get some recognition for her boy? Such indifference on the part of a wife would only have been possible if he had maltreated her or cast her off, but of this there is no pretense.

The undertaker testifies that he saw Lavinia and her sister Jennie watching the funeral from the corner of the street. He knew the girls and identifies them as having been pointed out to him by the witness Loweree who also testifies to having seen them. Notwithstanding their denials, I cannot doubt this statement.

Jerry died intestate. Although he might, under the power conferred by his father's will, have appointed the whole or any part of his father's estate to the use of Lavinia and her child, he did not do so. On his death-bed, he said his only regret was to leave his mother alone in the world. He made no allusion to them.

One would have supposed that even if the complainant had been born out of wedlock he would have remembered him in some way—made, directly or indirectly, some provision for his support. His neglect in this regard gives rise to a suspicion, in view of the evidence on this subject, that he may have come to doubt whether the child was his own.

*Fourth.* Lavinia's conduct, on the theory that she was Jerry's wife, was even more inexplicable after his death than before. To what extent, if at all, he supported her during the year preceding his death does not appear. It is certain that at his death she and her child were left destitute. Her good name and the future of her child, no less than her pressing pecuniary need,

would have impelled her, one would have supposed, to then come forward and prove, as she might easily have done if her story be true, her claim to be his lawful wife and her son's claim to be his legitimate heir. By her own confession she did nothing. On the contrary, after Jerry's death—how long after does not appear—she went to live at West Farms with a man by the name of Schofield; she says as his housekeeper. The evidence shows that she remained with him several years, and while there and afterwards went by the name of Mrs. Schofield, though not married to him. In December, 1887, she was delivered of a child by Dr. Beeker, at Schofield's house. This child, she testified, as if to make matters worse, was not Schofield's.

The first claim which complainant put forward was made about the year 1891, when he was about twenty years old. On that occasion he went to the house of Mrs. Haley and asked to see her, and said he was her grandson. On being told, as he says, that there was no such person living there, he went away and did not return. He says that he also wrote to her a year before he went there. Mrs. Haley denies having received any letter from him. The first step taken to vindicate his claim in the courts was in a proceeding in the orphans court in 1895. It failed on a ground not involving the merits of his case.

On the whole, it appears to me that it is far more probable that the relation between Jerry and Lavinia was illicit than that it was matrimonial, and I shall therefore advise a dismissal of the bill.