# Richmond.

## GREENHOW & ALS V. JAMES' EX'OR.

### APRIL 16TH, 1885.

1. MARRIAGE—*Lex loci—Lex domicilii.*—The law of the place of its cele-
   bration governs as to the forms of ceremony which constitute marriage.
   The law of the domicile governs as to the capacity of the parties.   But
   the rule which requires that "a marriage valid where celebrated, is
   valid everywhere else," has no application to a marriage entered into
   in a foreign country, in contravention of the public policy and statutes
   of the country of the domicile of the parties which pronounce marriage
   between them not only absolutely void, but *criminal.*

2. CONSTRUCTION OF STATUTES—*Bastards—Legitimation.*—Code 1873,
   ch. 119, §§ 6 and 7, providing that "if a man having had offspring by a
   woman shall afterwards intermarry with her, such offspring, if recog-
   nized by him before or after the marriage, shall be deemed legitimate,"
   and that "the issue of marriages deemed null in law, or dissolved by
   a court, shall, nevertheless, be legitimate," does not apply to and legiti-
   mate the offspring of a cohabitation in this state between a white per-
   son and a negro, when the parents subsequently have celebrated be-
   tween them a ceremony of marriage, outside of this state, in some place
   where marriage between such persons is lawful.

Appeal from decree of circuit court of Fredericksburg, ren-
dered at its June term, 1883, in the chancery cause of Green-
how and als *against* W. P. Conway, executor of Mary James,
deceased.

The object of this suit was to recover of said executor a leg-
acy given by the will of the testatrix, "to the children of Dade
Hooe," the plaintiffs claiming to be those children.   The ques-
tion was, whether or not they were the legitimate children of

Dade Hooe.    The decree was against them, and they appealed to this court.

Opinion states the case.

*Little & Little,* for appellants.

*E. E. Meredith,* for appellees.

HINTON, J., delivered the opinion of the court.

Sometime in the year 1830, or 1831, one Mary James, of the county of Stafford, departed this life, having first made her will, which was duly probated and recorded.    This will, along with the records of the county, was destroyed during the late war; but that portion of it which bears upon this case has been set up and established to the thorough satisfaction of all parties to this litigation, by the deposition of W. P. Conway, the surviving executor.    By this portion of the will, the said testatrix, Mary James, devised and bequeathed all of the residue of her estate, after the payment of her debts and sundry specific legacies, to the said W. P. Conway and R. C. L. Moncure, her executors, in trust, for the use of her brother, Wm. S. James, during his life, then for the use of her sister, Nancy Hooe, during her life, and after her death, for the use of Dade Hooe and George Hooe, sons of the said Nancy, for their joint lives, and if either should die without children, the whole for the use of the survivor for life, and at his death to *the children of the survivor in fee.*

The brother and sister of the testatrix departed this life many years ago, and soon after their death George Hooe also died unmarried and without issue, leaving Dade Hooe alone surviving, in whom the use of the whole residuum was vested for life, with remainder in fee to his children.    Soon after the death of the testatrix, the said Dade Hooe commenced to live and cohabit with one Hannah Greenhow, a woman of color.    These parties

continued to live together for upwards of forty years and until the death of Dade Hooe, in 1881. The fruit of this illicit intercourse was eleven children, the plaintiffs in this suit. In November, 1875, Dade Hooe and Hannah Greenhow, who were then, and afterwards remained domiciled in this state, went to Washington for the purpose, and there went through the ceremony of marriage in accordance with the forms prescribed by the laws of the District of Columbia.

The plaintiffs, who are also the appellants. were always recognized by Dade Hooe as his children, and there seems to be no doubt but that the ceremony of marriage was celebrated by their parents in the District of Columbia for the purpose of legitimatizing these children. This suit was instituted by these plaintiffs for the purpose of recovering of the executors certain bonds to which they claim to be entitled under the will of the said Mary James, as being the legitimate children of the said Dade Hooe.

Now it is argued for the appellants, that they are legitimate, first, because, although born out of wedlock, they must yet be considered as the issue of a marriage deemed null in law, who by the express words of the statute, Code 1873, chap. 119, § 7, are "nevertheless * legitimate"; and second, because under section 6 of the same chapter the subsequent intermarriage of the parents and recognition of the father, legitimated them.

It is clear, however, that if the words "issue of a marriage" used in the seventh section are to be taken, as we think they should, in their ordinary acceptation, that the plaintiffs cannot be regarded, either in fact or in contemplation of law, as the issue of the marriage, for the simple reason that their births antedated the marriage. This suggestion, therefore, might well be laid out of view. But assuming for the nonce that the true construction of this sentence is that contended for by the appellants, namely, that "under the case of *Coutts* v. *Greenhow*, 2 Munf. 372, prior born children are as much the *issue* of the marriage as those born afterwards," the question then arises,

whether the offspring of an illicit intercourse between a white person and a negro, both domiciled in Virginia, can be legitimated by a marriage subsequently solemnized in a state or district where the laws permit such marriages. And this question must, we think, at this day be both upon principle and authority, answered in the negative.

In *Brook* v. *Brook*, 9 H. L. Cas. 223, Lord Cranworth said: "The conclusion at which I have arrived is the same as that which my noble and learned friend on the woolsack has come to, namely, that though in the case of marriages celebrated abroad the *lex loci contractus* must *quoad solennitates* determine the validity of the contract, yet no law but our own can decide whether the contract is or is not one which the parties to it, being subjects of her majesty, domiciled in this country, might lawfully make."

"There can be no doubt as to the power of every country," says he, "to make laws regulating the marriage of its own subjects, to declare who may marry, how they may marry, and what shall be the legal consequences of their marrying. And if the marriages of all its subjects were contracted within its own boundaries no such difficulties as that which has arisen in the present case could exist. But that is not the case; the intercourse of the people of all Christian countries among one another is so constant, and the number of subjects of one country, living in or passing through another is so great, that the marriage of the subject of one country within territories of another must be a matter of frequent occurrence. So, again, if the laws of all countries were the same as to who might marry, and what should constitute marriage, there would be no difficulty; but that is not the case, hence it becomes necessary for every country to determine by what rule it will be guided in deciding on the validity of a marriage entered into beyond the area over which the authority of its own laws extends."

"The rule," says he, "in this country, and I believe generally in all countries is, that the marriage, if good in the country

where it was contracted, is good everywhere, subject, however, to some qualifications, one of them being that the marriage is not a marriage prohibited by the laws of the country to which the parties contracting marriage belong."

And in this same case, the lord-chancellor (Lord Campbell) after stating the general rule, that a foreign marriage, valid according to the law of a country where it is celebrated, is good everywhere, adds: "But while the forms of entering into the contract of marriage are to be regulated by the *lex loci contractus,* the law of the country in which it is celebrated, the essentials of the contract depend upon the *lex domicilii,* the law of the country in which the parties are domiciled at the time of the marriage, and in which the matrimonial residence is contemplated. Although the forms of celebrating the foreign marriage may be different from those required by the law of the country of domicile, the marriage may be good everywhere. But, if the contract of marriage is such, in essentials, as to be contrary to the law of the country of domicile, and it is declared void by that law, it is to be regarded as void in the country of domicile, though not contrary to the law of the country in which it was celebrated." And again he says, at page 219: "If a marriage absolutely prohibited in any country as being contrary to puplic policy, and leading to social evils, I think that the domiciled inhabitants of that country cannot be permitted, by passing the frontier and entering another state in which the marriage is not prohibited, to celebrate a marriage forbidden by their own state, and immediately returning to their own state, to insist upon their marriage being recognized as lawful."

In *Sottomayer* v. *DeBurros,* L. R. 3 Prob. Div. 5, Cotton, L., J., said: "But it is a well-recognized principle of law that the question of personal capacity to enter into a contract is to be decided by the law of the domicile. It is, however, urged that this does not apply to the contract of marriage, and that a marriage valid according to the law of the country where it is sol-

emnized is valid everywhere. This, in our opinion, is not a correct statement of the law. The law of a country where a marriage is solemnized must alone decide all questions relating to the validity of the ceremony by which the marriage is alleged to have been constituted; but as in other contracts, so in that of marriage, personal capacity must depend on the law of the domicile." See also to the same effect Dicey on Domicile, p. 202; *Williams* v. *Oates*, 5 Ired. 535; *Dupre* v. *Ex'or of Boulard*, 10 La. Ann. 411, and *State* v. *Bell*, 7 Baxter, 9; *Kinney* v. *Com.*, 30 Gratt. 858; *State* v. *Kennedy*, 76 N. C. 251. I have quoted thus largely from the authorities to show that the capacity to enter into the marriage contract, being one of the essentials of the contract, must be governed by the law of the domicile, and that whether the rule which requires that a marriage valid where celebrated is valid everywhere else arises out of all the comity between nations or *ex debito justitiæ*, yet that it can have no application to a marriage contract entered into in a foreign country in contravention of the public policy and statutes of the country of their domicile which pronounces a marriage between them not only "absolutely void," but criminal. In the very nature of things every sovereign state must have the power to prescribe what incapacities for contracting marriage shall be established as the law of the state among her own citizens, and it follows, therefore, that when the state has once pronounced an incapacity on the part of any of its citizens to enter into the marriage relation with each other, that such incapacity attaches itself to the person of the parties, and although it may not be enforceable during the absence of the parties, it at once revives with all its prohibitive power upon their return to the place of domicile. Fully impressed with the soundness of these views, we will only add that, in our opinion, sections 6 and 7 of chapter 119 of the code, do not contemplate a marriage made absolutely void by the express terms of the statute, and that an examination of the cases in this state, referred to

VOL. LXXX—81

in the brief of the appellants, will disclose nothing in conflict with the views herein expressed.

The decree of the circuit court of Fredericksburg is plainly right and must be affirmed.

LACY, J., and FAUNTLEROY, J., concurred in the opinion of HINTON, J.

LEWIS, P., dissented.

RICHARDSON, J., dissenting, said:

I do not concur in the opinion just delivered. There is no dispute as to the facts of this case. The sole question for consideration and determination is, whether the offspring of a cohabitation between a white person and a negro can, in Virginia, become legitimated, where the parties thus cohabiting, after the birth of the children, the offspring of such cohabitation, are married outside of Virginia, where such marriage is lawful.

The facts are these: Sometime about the year 1831, Mary James departed this life seized and possessed of considerable estate in the county of Stafford, where she died, leaving a will, by which she disposed of her property, and by which the late Judge R. C. L. Moncure and W. Peyton Conway were appointed her executors; which will was duly probated in said county of Stafford. The said will, with the records of said county, was destroyed by fire during the late war; but its contents, so far as necessary, have been established, and in that respect there is no dispute here.

By her will, after providing for the payment of her debts and sundry special legacies, Mary James devised and bequeathed all the residue of her estate to said R. C. L. Moncure and W. P. Conway, her executors, *in trust*, for the use of her brother, Wm. S. James, during his life, then for the use of her

sister, Nancy Hooe, during her life, and after her death, for the use of the said Nancy Hooe's two sons, to wit: Dade Hooe and George Hooe, during their joint lives, and if either should die without children, the whole for the survivor for life, and at his death to the *children of the survivor in fee.*

The first two life-tenants died many years ago, and soon thereafter the said George Hooe also died, unmarried and without issue, leaving Dade Hooe alone, in whom the use of the entire residuum became vested for life, with remainder in fee to his children.

Subsequent to the death of his aunt, the said testatrix, Dade Hooe commenced, and for many years continued, to cohabit, in Virginia, with one Hannah Greenhow, a woman of color, by whom he had eleven children, who are the appellants here, all of whom were always recognized by said Dade Hooe as his children, the relation and cohabitation between him and said Hannah Greenhow having lasted for some forty years, and was only terminated by his death in 1881.

In the year 1875, Dade Hooe and Hannah Greenhow were lawfully married in the city of Washington, in accordance with the laws of the District of Columbia, and afterwards returned to Stafford county, where they continued to live together until separated by death; the offspring of such cohabitation, the appellants here, having been all the time, both prior and subsequent to said marriage, recognized by Dade Hooe as his children.

The executors of Mary James faithfully executed the trusts committed to them. By the last report of said executors, it appears that there was a residuum of the estate which went into their hands, of one thousand dollars, which they had invested in Virginia state securities, which they held as trustees under the will of Mary James, for the use of Dade Hooe, the surviving life-tenant, to whom the interest on said investment had been regularly paid. Since the death of Judge Moncure, said securities have been held by the surviving executor, W. P.

Conway; and the appellants, claiming to be entitled to same, as the children of Dade Hooe, according to the terms of the devise by Mary James, made demand upon said surviving executor therefor; but he, being in doubt as to whether they were entitled thereto, refused to deliver said securities to them without first having the question judicially settled.

Accordingly, in February, 1883, the appellants filed their bill in the circuit court at Fredericksburg, setting forth substantially the facts aforesaid, claiming that under the laws of Virginia, they are the legitimate children of Dade Hooe, and as such entitled to said residuum, and praying that said surviving executor be required to deliver said securities to them, and for general relief. To this bill the said surviving executor, Conway, and the heirs at law of Mary James, the testatrix, were made parties defendant.

Conway, the executor, answered the bill, and, while in other respects he admitted its statements as to the claim of the complainants to the property in question, he simply submitted himself to the direction of the court. None of the heirs at law of Mary James answered the bill, nor have they in any way appeared or asserted any claim to the property in suit. It should also be stated, that Dade Hooe left a will, by which he devised all the estate, as follows: "I give my property, of every kind whatsoever, real or personal, in possession or in action, remainder or reversion, to which I am now entitled or may be entitled at the time of my death, or at any time afterwards, to the children of Hannah Greenhow, a woman of color, who is now and for many years has been living with me, the said children being eleven (11) in number, and being my natural children, or to such of the said children as may be living at my death, and the issue then living of such as may be then dead, such issue taking *per stirpes.*" This will was duly executed and witnessed by Judge R. C. L. Moncure and John M. Hull, and was duly proved by the subscribing witnesses, and admitted to record in Stafford county court, on the 20th day of July, 1881.

At the hearing of the cause, in June, 1883, the circuit court entered a decree holding that the plaintiffs, the appellants here, were not entitled to said fund; in other words, that these appellants cannot be considered, under the law of Virginia, the legitimate children of Dade Hooe. From that decree the case is here on appeal.

The precise question presented by the record in this case has never been decided by this court; that is, no case has been decided touching the legitimacy of the offspring of a cohabitation of a white person with a negro, when the parties thus cohabiting afterwards marry. We shall presently see that, upon principle, the question was long ago settled by this court, and in favor of the right asserted by the appellants in this case. In printed arguments on both sides, and in an oral argument on behalf of the appellants, the case has been ably presented. We were not favored with an oral argument on behalf of the appellees. A large number of authorities, both English and American, have been referred to, all of which, together with such others as were available, have been carefully examined. To examine and comment upon the numerous authorities to which we have been referred, would exhibit a curious and perplexing diversity of judicial determination, but could serve no really useful purpose here, as this case is, in my opinion, necessarily governed by our own statute.

By the 6th section of ch. 119, Code 1873, it is provided: "If a man, having had a child or children by a woman, shall afterwards intermarry with her, such child or children, or their descendants, if recognized by him before or after the marriage, shall be deemed legitimate." And by the 7th section of same chapter, it is declared that: "The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate." These humane provisions of our law stand in striking contrast to the barbarous common law principle by which all are and must remain bastards who are born out of lawful wedlock. Discussing this English doctrine, which has been utterly

discarded in Virginia, Carr, J., in *Davis* v. *Rowe*, 6 Rand. 355, said: "The framers of our law looked to these provisions of the English law to avoid, not to imitate, to pull down, not to build up; its principles are violated; its landmarks removed; its fences broken down; its traces obliterated."

There are, in Virginia, two chief grounds which render marriage absolutely void: These are, (1) marriage between a white person and a negro; and (2) marriage where there is an existing prior marriage, which constitutes the crime of bigamy.   In the first case named, that of marriage between a white person and a negro, which by the law of Virginia is punished as a felony by confinement in the penitentiary for a period of not less than *two* nor more than *five years;* yet for the crime of bigamy the period of confinement in the penitentiary is fixed at not less than *three* nor more than *eight* years.   See Acts 1877–8, p. 301–2.   This is singular legislative leniency in favor of intermarriage between white persons and negroes, especially in view of the abhorrence in which the amalgamation of the two races is held.   Doubtless the legislature was guided more by the purpose of stamping with disapprobation what in its judgment could, at most, be of but rare occurrence, than by the importance of fixing a heavy penalty to an offence so revolting as to need little, if anything, other than the restraints of social and moral sensibility.   Mr. Minor's conclusion seems to be that, in either of the cases named, though the marriage is void *per se*, it would be prudent to obtain a divorce, if either party desire to marry again.   1 Minor's Inst. 261–2.   This position of Mr. Minor indicates that, in his view, there are certain responsibilities, other than criminal, and certain rights incident to, or that may flow from a void marriage, which the law will regard.

Now, looking to the very comprehensive language of section seven, we have no authority for saying, nor could we be excused for assuming, that, for the purposes of this case, that language has no application.   It is true that that provision was

incorporated into our Code as long ago as 1785, and was not adopted with reference to, or intended to confer any benefit or right upon the colored race,—the negro in Virginia, at its passage, being a mere chattel. Hence in *Stones* v. *Keeling,* 5 Call, 148, Roane J., commenting upon the broad humane policy of this same provision of our law, and answering the argument of counsel, said: "It was also said, by the same gentleman, that my construction would legitimate the children of a white man and a negro woman, when the marriage ceremony has taken place. The answer is easy and evident: The law concerning marriage is to be construed and understood in relation to those persons only to whom the law relates; and not to a class of persons clearly not within the idea of the legislature when contemplating the subjects of marriage and legitimacy." The law thus enacted without reference to, or with any intention on the part of the legislature to benefit the negro, in his then status, stands unchanged to-day, and we are bound upon well settled principles, to presume that it remains unchanged by deliberate legislative design, founded in the enlightened humane policy which disdains to visit the sins of the parent upon the unoffending child. True, by our statute, Acts 1877–8, above referred to, the marriage of a white person with a negro is a crime, and though the marriage be entered into beyond the limits of the State, where such marriage is lawful, yet, if the parties reside in this State and go beyond its limits and are lawfully married in accordance with the laws of the State or place where the marriage is celebrated, and then return to their domicile here, they are amenable to the law which they have sought to evade. This subject was very fully discussed by Christian J. in *Kenny* v. *The Commonwealth,* 30 Gratt. 858; but obviously the doctrine discussed and the principles laid down in that case, have no application to this case. As touching the parties to the marriage, that case was like this; there a black man and a white woman, domiciled in Augusta county, Virginia went to Washington city, and were there duly married, but returned

immediately to their home in this State. There was a prose-
cution and conviction, which upon writ of error was affirmed
by this court. Had there been a similar prosecution against
the parties to the marriage, the parents of the appellants in this
case, the result would. doubtless, have been the same. But
this is no criminal prosecution for either bigamy or the mar-
riage of a white person with a negro; but here the children,
the unoffending offspring of a repulsive alliance, come asking
only the protection which, in unmistakable terms, the law in
its benignity, extends to them; and when too, there is not even
an adversary claimant to that which they seek as rightfully
their own. Surely they are entitled to it by the plain language:
"If a man, having had a child or children by a woman, shall
afterwards intermarry with her, such child or children, or their
descendants, if recognized by him before or after the marriage,
shall be deemed legitimate," &c. The law was on the statute
book irrespective of the black man, and many years before the
negro attained to his present status. The law has stood still;
but in the meantime, the negro has grown into its gracious
protection; he has been clothed with citizenship; he is, in the
language of the statute, a man, and while the idea of amalga-
mation is repugnant to the white race, and intermarriage be-
tween the races is prohibited under heavy penalties by the law,
yet the dominant white race has not yet struck, nor will it
likely ever strike at the natural legal rights of unoffending
children through the sins of their parents. The policy of our
law is quite the contrary. The argument on behalf of the ap-
pellee that Dade Hooe and Hannah Greenhow were not really
married, but only attempted to commit an act which the law
declares to be absolutely void, is utterly fallacious. Had they
after marriage, remained in the District of Columbia, or out-
side of this State, the Virginia law would not have been vio-
lated, and they could not have been pursued. It might as well
be said that persons similarly situated, and never residents of
this State, but duly married in the District of Columbia or

other place where such marriages are lawful, could not become residents of this State. This would be so palpably in violation of the principle of comity between the States that the idea could not be for a moment entertained.

Again, bigamous marriages are absolutely void, yet the law legitimates, in its humanity, the innocent issue of such marriages. Bigamous negro marriages are punishable just as such marriages between white people are punished. In each case it is the crime which the law abhors and punishes, and not the unfortunate issue of the marriage which in law is void.

Dade Hooe lived a life greatly offensive to the law and society. In his old age he did what in the eye of the law and good morals was perhaps the best thing he could do under the circumstances; he sought to relieve his acknowledged children from the blight and curse of bastardy; and in this he doubtless did what he thought was best in attempting to advance the interest of those who had the greatest claim upon his affection and bounty.

*Stone* v. *Keeling*, 5 Call, 143, was a case in which the issue of a woman by a second marriage, which took place during the lifetime of her first husband, were held legitimate after the death of their father. In delivering the opinion, Roane, J., said: "This is a mere civil controversy to ascertain the right of property." And the judge was careful to remark upon the importance of keeping the first marriage out of view, thus taking the precaution of shielding the children against the criminal bigamous act of their mother. Further on the same judge says: "The second marriage, therefore, was not lawful; it was even void; but we cannot, in this case, say it was *criminal.* *    *
*    *    *    *    *    * But if it were otherwise, if the legislature should ever be supposed to consider every second marriage, living a first husband or wife, as criminal, wherefore should they visit the sins of the parents upon the innocent and unoffending offspring? But this was not the temper of the legislature. In the case of incestuous marriages, when the parties with the full

knowledge of the everlasting bar which does and ought to exist between them, enter into this contract, and produce an innocent offspring in defiance of laws human and divine; where you cannot suppose a circumstance of excuse, except the scarcely possible one of an ignorance of the consanguinity which exists between the parties, their offspring is not bastardized by our laws." The reasoning of Judge Roane is peculiarly appropriate to the case in hand; and it is difficult to conceive how, upon principle, a distinction can be taken between that case and this. Bigamy is a crime; so is marriage between white and colored persons. In fact, if I was guided only by the punishment inflicted, as has been shown, the latter is the lesser offence. I think this case is ruled by *Stone* v. *Keeling,* *supra.* Many other authorities to the same effect might be cited. I may mention *Sleigh* v. *Striver,* 5 Call, 439; 3 H. & M. 225; *Bennett* v. *Toler,* 15 Gratt. 621–2; *Coutts* v. *Greenhow,* 2 Munf. 363; *Ash* v. *Wey's adm'r,* 2 Gratt. 203: and other cases which go further and hold that though the parties leave the state where the marriage is prohibited and to evade the law of their domicile, and are married and return to their domicile, still the marriage is valid. *Putnam* v. *Putnam,* 8 Pick. (Mass.) 433; *Medway* v. *Needham,* 16 Mass. 157. For an able and exhaustive discussion of the whole subject, upon a full examination of all the authorities, see *Van Voorties* v. *Brintwall,* 86 N. Y. (court of appeals) 18.

In view of all the circumstances, I am of opinion, that by virtue of the marriage of Dade Hooe to Hannah Greenhow, in the city of Washington, and the continuous recognition of their children, the appellants, both before and after said marriage by Dade Hooe, their father, they are his legitimate children, and as such entitled to the fund in question; and that therefore the decree of the court below should be reversed and annulled.

DECREE CONFIRMED.