## In re VETAS' ESTATE. VETAS v. VETAS.

No. 6818.   Decided June 13, 1946.   (170 P. 2d 183.)

See 39 C. J., Marriage, sec. 3; 35 Am. Jur., 285, 287.  Validity of common-law marriages in American jurisdictions, note, 133 A. L. R., 758.

*George S. Barker* and *Thatcher & Young*, all of Ogden, for appellant.

*Ira A. Huggins* and *Howell, Stine & Olmstead*, all of Ogden, for respondent.

McDONOUGH, Justice.

The district court held that appellant was not the wife of decedent George Vetas, denied her petition for letters of administration, and appointed the Commercial Security Bank of Ogden to act as administrator, and she appeals. Only questions of law are presented for our determination.

Appellant asserts that the court erred in finding that she was not the lawful wife of decedent.

Section 102-4-1, U. C. A. 1943, provides that letters of administration shall be issued upon application, according to the following order of preference, to: (1) Surviving husband or wife; (2) children; (3) father or mother; (4) brothers or sisters; (5) grandchildren; and (6) next of kin. Section 102-4-3 provides that if persons entitled to letters of administration fail to appear within 3 months, letters of administration must be granted to any interested applicant. Appellant, claiming to be the surviving wife of decedent, filed her petition within the 3 months' period following death of decedent, so the right of appellant to have letters of administration issued to her in the event of a contest, would necessarily depend upon whether she was in fact a member of the preferred class.

A brother of decedent challenged the competency of appellant to apply for appointment as administratrix during said period by filing an answer to her petition in which answer he denied that she was ever married to the decedent.

Respondent points out that under Section 102-4-2 the

court is authorized to appoint any competent person to serve as administrator if

"a dispute arises as to relationship between applicants, or if there is any other good and sufficient reason."

It contends that under this section, appointment of the bank to act as the administrator, must be upheld. However, it is clear from the findings of fact and conclusions of law that the lower court did not act alone under the quoted portion of Sec. 104-4-2, but proceeded to determine whether appellant was legally the wife of decedent. The answer to the petition and the reply to such answer, raised an issue as to whether appellant was married to decedent. The issue of marriage was therefore a proper one to be determined by the court prior to the appointment of an administrator.

By reply of appellant she alleged that she became the wife of George Vetas on February 14, 1932, by a common-law marriage contracted in the state of Idaho. She made no claim that either she or said George Vetas ever had a domicile in Idaho. In fact, her testimony clearly shows that both were residents of Utah during the entire time in question, and that the parties went to Idaho for the sole purpose of marriage and with the intention of returning to this state almost immediately thereafter. The facts as set forth in the findings, in substance, are as follows:

For some time prior to February 14, 1932, appellant and decedent kept company with each other. They were both residents of Ogden, Utah. On February 13, 1932, they decided to go to Salmon City, Idaho, where appellant's sister resided, to be married. On the morning of the 14th they drove to Salmon City. They there went to the courthouse to find a justice of the peace and to procure a marriage license. As it was Sunday, they were unable to locate either a justice of the peace or the marriage license clerk at the courthouse. George Vetas then said to appellant,

"What's the use. We're married anyway." Appellant replied, "That's okay by me."

They then went to the home of her sister and represented themselves as being married, and received congratulations from her relatives and friends. They occupied the same bed that night at the home of appellant's sister and returned to Ogden the following day. En route to Ogden they stopped for a short time at Pocatello, Idaho, where they announced to a friend residing there that they were married and received the friend's congratulations. Thereafter, they held themselves out as husband and wife, and continued to live together at Ogden where decedent was engaged in business, until his death on June 7, 1944.

We have heretofore held that a common-law marriage cannot be consummated in this state; that marriage in this state must be solemnized as required by our statutes. *Schurler* v. *Ind. Comm.*, 86 Utah 284, 43 P. 2d 696, 100 A. L. R. 1085; and *Sanders* v. *Ind. Comm.*, 64 Utah 372, 230 P. 1026. The lower court concluded, as indicated hereinabove, that appellant had not entered into a valid marriage with decedent. In a memo opinion filed by such court this conclusion was reached by the court assuming that though the evidence was sufficient to support a finding that as between residents of Idaho a "common law" marriage would have been contracted; nevertheless by virtue of Sec. 40-1-2, U. C. A. 1943, such purported marriage was void.

Said section reads:

"Marriages Prohibited and Void.

"The following marriages are prohibited and declared void:

"(1) With an idiot or lunatic, with a person afflicted with syphilis or gonorrhea that is communicable or that may become communicable, or with a person subject to chronic epileptic fits; provided, that the last disqualification shall not apply to any male or female who has been sterilized.

"(2) When there is a husband or wife living from whom the person marrying has not been divorced.

"(3) When not solemnized by an authorized person, except as provided in Section 40-1-5.

"(4) When at the time of marriage the male is under sixteen or the female in under fourteen years of age.

"(5) Between a negro and a white person.

"(6) Between a Mongolian, member of the malay race or a mulatto, quadroon, or octoroon, and white person.

"(7) Between a divorced person and any person other than the one from whom the divorce was secured until the divorce decree becomes absolute, and, if an appeal is taken, until after the affirmance of the decree."

Section 40-1-5 provides:

"Solemnization—Before Unauthorized Person—Validity.

"No marriage solemnized before any person professing to have authority therefor shall be invalid for want of such authority, if consummated in the belief of the parties or either of them that he had such authority and that they have been lawfully married."

The trial court in its opinion refers to Sec. 132 of the Restatement of the Law: Conflict of Laws, page 197, reading:

"Marriage Declared Void by Law of Domicil.

"A marriage which is against the law of the state of domicil of either party, though the requirements of the law of the state of celebration have been complied with, will be invalid everywhere in the following cases:

"(a) polygamous marriage,

"(b) incestuous marriage between persons so closely related that their marriage is contrary to a strong public policy of the domicil,

"(c) marriage between persons of different races where such marriages are at the domicil regarded as odious,

"(d) marriage of a domicliary which a statute at the domicil makes void even though celebrated in another state."

The court points to paragraph (d) of the rules quoted from the Restatement; and construing paragraph (3) of Sec. 40-1-2 as declaring void a marriage not "solemnized by an authorized person," holds that a common law marriage entered into in a state which recognizes such marriage will not be recognized in Utah as to persons here domiciled at the time such purported marriage is contracted in such sister state.

We address ourselves to this proposition. The marriages covered by paragraphs (a) and (b) of Sec. 132 of the Re-

statement were invalid at common law and would be so declared regardless of statute. 1 Schuler, Marriage, Divorce, etc., Sec. 16, p. 21 and Sec. 21, p. 31; 35 Am. Juris., Marriage, Secs. 140, 141 and 148; 1 Bishop, Marriage, Divorce and Separation, Chaps. XXIV and XXV; 2 Beale, Conflict of Laws, Sec. 132.1 and Sec. 132.2. As to inter-racial marriages, the question would be decided upon determination of whether such unions are regarded as odious at the domicile. Paragraph (d) does not declare void a marriage of a domiciliary contracted in a foreign state in compliance with its laws by mere force of a statute which would make the union invalid if entered into in the domiciliary state. Rather, it states that such marriage will be invalid everywhere if the statute of the domicile makes it void *"even though* celebrated in another state."* (Emphasis supplied.) If such statute expressly or by necessary implication declares a foreign marriage, entered into by one domiciled in such state, void, then it will be held void wherever it is called into question. But, if not expressly so declared, or if the necessary implication of a statute is not that its prohibitions extend to marriages entered into elsewhere than at the domicile, it will not generally be construed to have application to such marriages. *State* v. *Shattuck*, 69 Vt. 403, 38 A. 81, 40 L. R. A. 428, 60 Am. St. Rep. 936. And see: Vol. 1, Schuler, Marriage, Divorce, Separation and Domestic Relations, p. 56, Sec. 33; 1 Bishop, Marriage, Divorce and Separation, Sec. 843, et seq. However, as to legal impediment to inter-marriage, see *Greenhow* v. *James' Ex'r*, 80 Va. 636, 56 Am. Rep. 603.

In *Sanders* v. *Ind. Comm.*, supra, par. (7) of Sec. 40-1-2, C. L. U. 1943 (and its provisions insofar as here involved were in substance the same at the date of the decision), was held applicable to a marriage solemnized in Wyoming in conformity with the laws of that state. But such was held to be the necessary intendment of such paragraph read in light of Sec. 3001, Sec. 3002 and Sec. 3003, C. L. U. 1917. The first two of such sections, as construed, provide for a mere interlocutory decree of divorce which was held not

to dissolve the marriage relation. The third made it unlawful for either party to marry any person other than the other party to the divorce proceeding during the six month period allowed for appeal from the "final decree," and, if an appeal be taken, until affirmance of the decree. It further provided that "any marriage contracted in violation" of the provisions of the section "shall be null and void."

In light of the foregoing we return to a consideration of Sec. 40-1-2(3) U. C. A. 1943, declaring a marriage void when not solemnized by an authorized person. We consider it in connection with Sec. 40-1-4, U. C. A. 1943. (Both sections have been on the statute books of this state since before statehood. See C. L. U. 1888, Sec. 2584, and R. S. U. 1898, Sec. 1186.) Sec. 40-1-4 declares:

"Marriages solemnized in any other country, state or territory, if valid where solemnized, are valid here."

The problem narrows to this: Do these two sections evidence a legislative intent to recognize a marriage in another state between parties domiciled in Utah only if it is formally entered into—"solemenized"—before a person authorized by the laws of such state to perform a marriage ceremony; or is Sec. 40-1-4, supra to be construed as voicing the general rule that a marriage lawful where celebrated or contracted is lawful everywhere? What we may here say in resolving the question we confine to marriages of persons domiciled in Utah whose marriage in another state or country, while here domiciled, is brought into question; and shall assume, for the purposes of this decision, that in the enactments now under examination it was not the purpose to legislate with respect to the marriage in another jurisdiction of persons there domiciled.

The purpose of enactments requiring the solemnization of marriage before an authorized person, together with those dealing with the prior procurement of a license, is doubtless to protect the parties to the marriage contract in the rights flowing therefrom, and likewise ■

■

to protect their offspring. A solemn record of the contract is made to which recourse may be had when rights or obligations of the husband or wife arising from the marriage are in issue. So, too, are the interests of third parties in dealing with either of the contracting parties, subsequent to marriage, thus protected. Other advantages of a formal recorded ceremony might be cited, but those just adverted to will suffice in considering the intendment of the provisions in question.

To effect such objects a marriage must, in this state, be "solemnized before an authorized person" to be valid. But should persons domiciled in this state go to a neighboring state and attempt to contract a common law marriage, the protection of the parties, their offspring and the public, which the statute was designed to effect, would not result should such attempted marriage be recognized here. With this fact in mind, we consider Sec. 40-1-4.

Insofar as neighboring states are concerned the wording of this section is perculiar to Utah. Thus the California Code provides:

"All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted are valid in this state." Civil Code of California, § 63 (1941 Ed.)

This section was enacted in 1872. Identical provisions are found in Idaho (Idaho Code Anno. 1932, § 31-209) and Montana (Revised Codes of Montana, § 5707), while Colorado has an identical enactment with a proviso relative to bigamy and polygamy (Colorado Statutes Anno. 1935, Vol. 4, c. 107, § 4). By contrast with neighboring examples the section of our code specifies that

"marriages *solemnized* in any other country, state or territory, if valid where *solemnized*, are valid here." (Emphasis added.)

We think the use of the italicized word was made advisedly and that this section, construed with paragraph (3) of Sec. 40-1-2, supra, evidences a legislative pronouncement that as to domiciliaries of Utah a common law mar-

riage contracted in another jurisdiction would not be here recognized. To be valid as between domiciliaries of this state a marriage must be "solemnized" either in accordance with the laws of this state or those of another jurisdiction. Webster's New International Dictionary, Second Edition, defines "solemnize" thus:

"To perform with pomp and ceremony or according to legal forms; specif.; to unite a couple in marriage with religious ceremony; * * *."

That the word was used in this sense is abundantly clear from its employment in the two provisions under examination, as well as elsewhere in the chapter of which they are a part. Taking into consideration the purposes of the statute requiring solemnization within the state, the meaning of the words employed, the departure from neighboring examples in the employment of the word "solemnized" in Sec. 40-1-4, supra, the holding is compelled that persons domiciled in Utah may not go into another state, there contract a "common law marriage," and, returning here, have such marriage recognized as valid.

It follows that the finding of the trial court to the effect that appellant was not the wife of George Vetas during his life-time, and hence not his surviving widow, must be sustained. The judgment of the district court is affirmed. Costs to respondent.

WOLFE, Justice (concurring specially).

I rest my concurrence upon the ground set out in the opinion of Mr. Justice McDONOUGH. I think our courts are required not to recognize a marriage which is consummated by domiciliaries of this state in another state according to the laws of that state when such marriages are in violation of the strong public policy of this state. Sec. 40-1-2, U. C. A. 1943, prohibits and makes void certain marriages in this state and thus declares in part the public policy of this state. Our courts should not recognize a marriage by

our residents made in another state against our announced public policy.

Under *Williams* v. *North Carolina*, 325 U. S. 226, 65 S. Ct. 1092, 89 L. Ed. 1577, 157 A. L. R. 1366, we are free to enforce our own public policy insofar as our residents are concerned. Under Sec. 40-1-2, Utah has formulated a public policy insofar as our residentials are concerned. It is unlikely that, after adopting such a policy the legislature would, by Sec. 40-1-4, compel recognization of marriages by Utah residents in violation of that public policy accomplished by crossing the line and contracting marriage.

I think a logical and natural distinction could be drawn between marriages in violation of the provision of Sec. 40-1-2 on the one hand and common-law marriages on the other. The former involve a disability on the individuals who would contract marriage. The latter involve merely the formalities necessary to create the marital status. Thus under Sec. 40-1-2, a negro and a white person cannot marry in Utah. No matter what type of ceremony is performed or procedure followed, they cannot create the status of man and wife in Utah and the public policy is against recognizing that status as existing. The policy is equally strong whether they marry in Utah or in some other jurisdiction, whether they comply with the formal requisites or not. The same is true as to polygamous marriages, marriages by persons with social diseases which are communicable, marriages by idiots, etc. But the policy may not be enforceable against nonresidents of Utah who marry elsewhere and then take up residence in Utah.

In the case of common-law marriages contracted in Utah, there is ordinarily no disability of the parties themselves. They could, by following the requisite formalities, take on the status of husband and wife. The invalidity springs from their failure to have a proper ceremonial marriage. If they go to another jurisdiction and comply with the formal requirements of that jurisdiction there is less justification for a refusal to recognize that marriage than in the case of other marriages violative of Sec. 40-1-2. The public policy

is not against the contracting parties maintaining the status of man and wife in Utah; rather it is against the failure of the parties to have a ceremonial marriage. It should be noted that this distinction appears to be recognized by Sec. 132, Conflict of Laws, American Law Institute, set out in the opinion of Mr. Justice McDONOUGH.

But after all this has been said, Sec. 40-1-2, paragraph 3, prohibits and makes void marriages in Utah when not solemnized by an authorized person. That is declaratory of the public policy in Utah applicable to residents of Utah. And I do not see how we can make a distinction between marriages made in another state by domiciliaries of this state not solemnized (common law marriages) and other marriages prohibited and made void by Sec. 40-1-2 when such marriages are made between our domiciliaries in another state, such with an idiot or lunatic for instance. Logically all marriages proscribed by Sec. 40-1-2 whether with one having a disability or because not solemnized when made by our domiciliaries outside of this state would be against our announced public policy and our courts should therefore not recognize them.

WADE, Justice (dissenting).

I dissent.

I agree that the question of the validity of the marriage was a proper one to be decided in this action and that the decision is binding on the parties hereto; that a common-law marriage cannot be consummated within this state, but that a marriage entered into within this state must, to be valid, be solemnized as required by our statutes; that if the marriage here in question is contrary to the public policy of this state as declared by our legislature then even though it is valid where entered into it is still invalid here. I am not averse to the public policy announced in the prevailing opinion if it were declared by the legislature, but it is the legislature and not the courts which has the responsibility of establishing the public policy and in the absence of a

legislative enactment or a well established usage the courts should not be concerned with the establishment of a public policy, and when it does it is judicial legislation. I do not agree that the legislature of this state or this court has ever previously declared the public policy of this state to be as announced in the prevailing opinion.

As stated in the prevailing opinion, Section 40-1-2, U. C. A. 1943, prohibits and declares void marriages:

"(3) When not solemnized by an authorized person * * *."

There is an exception to the above quoted provision of paragraph (3) but this marriage does not come within such exception, so if the legislature intended to prohibit and declare void not only marriages consummated within this state but also marriages wherever entered into, when not solemnized by an authorized person, then this marriage is void. I cannot agree that such was the legislative intent. I believe that in enacting the above section the legislature intended it to apply only to marriages entered into within this state and had no intention to prohibit or declare void such marriages if consummated in any other country, state or territory.

This section not only declares void but expressly prohibits all marriages therein enumerated. Certainly our legislature did not presume to prohibit such marriages in states and territories and foreign countries outside of its boundaries. This section is a part of the chapter which deals with "Marriage." It limits the persons who may solemnize a marriage; it forbids a marriage without a license issued therefor by the county clerk; it requires the person solemnizing the marriage to return the license to the county clerk whence it was issued and the clerk to keep a record thereof; it makes it a criminal offense for an unauthorized person to solemnize a marriage, for any person to solemnize a marriage without a license, for any person to knowingly solemnize a prohibited marriage or for a county clerk to issue a license for a prohibited marriage; and forbids the issuance of a license therefor until

each applicant shall file with the county clerk a health certificate required by the statute. While there is no express provision that any of these provisions shall apply only to marriages performed within this state, it is clear from the context that they were so intended.

The prevailing opinion expressly limits its rule to cases where citizens of this state go into another state for the sole purpose of being married and then returning to this state to live. But there is nothing in the statute which indicates an intention to make any such distinction. There is nothing in the express terms of the statute which indicates that a common-law marriage entered into in a state where such marriage is valid by citizens of such state will be recognized as valid in this state any more than will such a marriage entered into in such state between citizens of this state who go into such other state for the purpose of marriage only. Any such distinction if made must be read into the statute by the court without any aid from the wording of the statute. It would be a shocking situation for this state to attempt to declare all common-law marriages between people who come into this state to be void. And yet if we make a distinction between such marriages and the marriage here in question, we must read something into the statute which just is not there.

Further, Section 40-1-4, U. C. A. 1943, provides that:

"Marriages solemnized in any other country, state or territory, if valid where solemnized, are valid here."

This to my mind is an express recognition by the legislature that the other sections of the chapter on "Marriage" are dealing only with marriages performed within this state, and that this section deals with marriages entered into outside of this state. The prevailing opinion assumes

"for the purposes of this decision, that in the enactments now under examination it was not the purpose to legislate with respect to the marriage in another jurisdiction of persons there domiciled."

This seems to assume without argument, contrary to the express provisions of Section 40-1-4, the main question here involved. That section uses the language:

"Marriages solemnized in any other country, state or territory * * *."

There is nothing in that language which remotely suggests that it did not propose to deal with all marriages entered into outside of this state.

Section 40-1-4 does not expressly declare any marriage invalid. It merely provides that certain marriages are valid. If it has the effect of making any marriage invalid it does so by implication only. If by implication that section makes invalid a marriage between persons domiciled here, where entered into outside of this state without a ceremony, it would seem to have the same effect, as far as this state is concerned, on such a marriage between persons domiciled outside of this state. On the other hand, if this marriage is held invalid under Section 40-1-2, subdivision (3), because not solemnized by an authorized person, it would seem to require not only a ceremony but also that the person officiating therein be authorized to do so in accordance with the chapter in our statute on marriages of which that section is a part, and not such as is authorized to so officiate by the laws of another state. In either event, there is not a word in our laws which indicates a policy of this state to invalidate a common law marriage between persons domiciled within and which is entered into outside of this state, and not have the same effect on such a marriage between persons not domiciled within this state.

It is conceded that the public policy does not necessarily have to be declared in this statute but could have to be declared by other statutes or by other means. For instance, a polygamous marriage is not only made invalid by Section 40-1-2, subdivision (2), but there is a constitutional provision forbidding not only such marriages but also cohabitation with more than one person of the opposite sex, and a statute making it a criminal offense to enter into

such marriage or to so cohabit. There is also a statute making incestuous marriage or incestuous cohabitation a crime. Such marriages are probably invalid in this state regardless of whether they were valid at the time and place where entered into, and notwithstanding the provisions of section 40-1-4 to the contrary. But I find nothing in our statutes or elsewhere that indicates the public policy announced in the prevailing opinion. The arguments to that effect therein merely indicate reasons why the legislature might have so provided by statute and not that it did so provide. I cannot believe that the legislature used the word "solemnize" advisedly, intending thereby to make all common-law marriages entered into outside of this state invalid as far as this state is concerned. Nor can I believe that it intended thereby to make a distinction between common-law marriages entered into outside of this state between persons domiciled here and where such marriages are entered into outside of this state between persons not domiciled here. Surely, if it had such a situation in mind and intended the result reached in the prevailing opinion, it would have expressed such intention more clearly.

By its general use the word "solemnized" is not so restricted in its meaning so as to include only ceremonial marriages and the way it is here used to my mind indicates that it was intended to cover all marriages entered into or which were consummated outside of this state, whether celebrated by a ceremony or not. 39 Words and phrases, Perm. Ed., 453; *Dyer* v. *Brannock*, 66 Mo. 391, 27 Am. Rep. 359; *Bowman* v. *Bowman*, 24 Ill. App. 165; *Pearson* v. *Howey*, 11 N. J. L. 12, 6 Halst. 12. Under this interpretation of that term the statute has expressly provided that a common-law marriage if valid where entered into is valid in this state.

The cases cited in the prevailing opinion do not hold that we have any such public policy as is therein announced. In *Schurler* v. *Industrial Commission*, 86 Utah 284, 43 P. 2d 696, 697, 100 A. L. R. 1085, a man and woman had lived together in this state as husband and wife for approximately

21 years. No marriage ceremony was claimed either here or elsewhere. We said:

"In this state a common-law marriage cannot be consummated. By this we do not mean to say that a common-law marriage consummated in a state where it is recognized [as valid] would not be valid here. In this state marriage must be consummated by a ceremony as provided by the statutes."

That case does not announce a public policy of this state not to recognize a common-law marriage consummated in a state where it is recognized as valid even though such marriage is between citizens of this state who went into the other state for the purpose of marriage only. In *Sanders* v. *Industrial Commission,* 64 Utah 372, 230 P. 1026, 1027, Ruby Clark Sanders claimed to be the surviving widow of R. O. Sanders, who was killed in a mine explosion. Sam Saris, her former husband, obtained a divorce on April 25, 1923, which did not become absolute until six months thereafter. Ruby married R. O. Sanders in Evanston, Wyoming, on June 16, 1923, before the decree had become absolute. We held that:

"Ruby Clark Sanders had an undivorced husband living at the time of the pretended marriage ceremony."

And therefore under our statutes, although the ceremony was performed outside of the state, such marriage was void, citing what is now Sections 40-1-2, subdivisions (2), (3) and (7), 40-3-6, 7 and 8. There was no claim that such a marriage would be valid in Wyoming and no common-law marriage was involved.

As I read the statutes of Idaho, Sections 31-201, 203 and 301, Idaho Code Annotated, and the construction placed thereon by the courts, *Huff* v. *Huff,* 20 Idaho 450, 118 P. 1080; *Dawson* v. *United States,* 9 Cir., 10 F. 2d 106, a common-law marriage entered into in that state is valid and the facts found by the court in this case clearly show a common-law marriage. I therefore think the case should be reversed.

PRATT, J., not participating.