47 N.J. Super. 215 (1957)
135 A.2d 673
ALICE WINN, KNOWN ALSO AS ALICE WIGGINS, PLAINTIFF-APPELLANT,
v.
WALTER WIGGINS, WILEY WIGGINS, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1957.
Decided October 25, 1957.
*218 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Robert S. Hartgrove argued the cause for appellant.
Mr. Henry Milberg argued the cause for respondents (Mr. Joseph Moritz, attorney; Mr. Samuel Milberg, of counsel; Mr. Henry Milberg, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
The only question raised and argued on this appeal is the correctness of the trial court's finding and adjudication that plaintiff was not the common-law wife of decedent George F. Wiggins, who died intestate in Jersey City on October 18, 1955. Plaintiff had sought a declaratory judgment establishing the validity of an alleged common-law marriage with Wiggins so that she, as his widow, would inherit a dwelling house standing in his name, to the exclusion of defendants, his surviving heirs. She also sought a declaration that she was joint owner of the house and that defendants held it in trust for her sole benefit or, in the alternative, that she was entitled to an equitable lien thereon, by reason of fraud perpetrated upon her when decedent acquired title in his own name. The court ruled that she failed to prove fraud, and that ruling is not challenged.
Plaintiff and decedent were residents of Jersey City for more than 20 years preceding his death. They lived together at 428 Jackson Avenue from 1941 until 1946, when decedent purchased the house in question, occupied by the two of them until his death. The court found as a fact that she and decedent lived together as man and wife from 1941, and that finding is well established by the testimony of plaintiff's own witnesses. There can certainly be no question that they posed as husband and wife after 1944, the year of the alleged common-law marriage.
The evidence establishes that decedent married one Alma Crosby in 1918. She died as Mrs. Alma Oakley in 1947. There is no proof that the marriage was ever dissolved; *219 in fact, decedent's brother testified there was never a divorce. In 1928 decedent married a Sarah C. Amaker, who was then married to one James Amaker. The Amaker marriage was never dissolved; indeed, Amaker was still living in Philadelphia at the time Sarah died in 1952. Plaintiff herself testified that at the time of the alleged common-law marriage decedent told her about the Amaker woman. Notwithstanding this knowledge she entered into the informal marital bond. Although she knew that Mrs. Amaker died in 1952, she never requested decedent to enter into a ceremonial marriage.
Direct proof of the alleged common-law marriage comes from the mouth of plaintiff alone. She testified that sometime in July 1944 she and decedent discussed matrimony. He suggested they go South because Sarah Amaker, "this woman he was supposed to be married to, * * * had given him a lot of trouble and he was afraid she would give him more trouble." Consequently, and apparently with a most casual disregard for any possible impediment to decedent's marrying anyone, they planned a ceremonial marriage at the home of decedent's relatives in the South. This informal and unconventional view of community mores and the law itself seems to have characterized the entire course of their relationship, from 1941 on.
Plaintiff's account of the common-law marriage was that while waiting for train connections in Atlanta, Georgia, decedent said he had been thinking the matter over; that if there were a ceremonial marriage it would get into the newspapers and Sarah Amaker would learn of it, and he said "What do you say if you and I just be man and wife?" She said "I will," and then "Will you be my husband," to which he answered "I will." (We remark upon the unexpected precision of this verbal exchange, which so accurately meets the legal requirement of our cases of a marital undertaking per verba de praesenti.) They then visited decedent's brother in Columbus, Georgia, went on to visit his mother in Dawson, Georgia, and then proceeded to still another brother in Jacksonville, Florida. They again exchanged *220 marital vows there before visiting the brother. While plaintiff testified that decedent introduced her to his relatives in the South as his wife, they testified to the contrary.
The parties remained in the South no more than two weeks and then returned to Jersey City where they held a reception for friends and relatives and decedent introduced plaintiff as his wife. Although plaintiff thereafter claimed that status, she used her former name of Alice Winn to vote and in connection with gas, electric and telephone services. When decedent died she provided the information which appears on his death certificate, where he is described as "Widower."
We take particular note, as did the trial court, that in her complaint filed February 14, 1956 plaintiff initially alleged that she and decedent had "lived together as man and wife although unmarried to each other." This was repeated in her first amended complaint filed shortly thereafter. In the second amended complaint, filed July 15, 1956, these allegations were deleted and in lieu thereof plaintiff alleged that she and decedent had contracted a common-law marriage in the States of Georgia and Florida in July 1944.
The two essentials of a common-law marriage are capacity in the parties and their mutual consent presently to become man and wife. Simmons v. Simmons, 35 N.J. Super. 575, 579 (App. Div. 1955). By reason of N.J.S.A. 37:1-10, which declares void any common-law marriage contracted after December 1, 1939, the parties must also show that the common-law marriage was recognized under the laws of the state where it occurred. Georgia and Florida were evidently such states in 1944.
We are not concerned here with the question of whether the prior ceremonial marriage to Alma Crosby in 1918 was an impediment to the alleged common-law marriage in 1944. Suffice to say that under our holding in the Simmons case, presuming the validity of decedent's 1918 marriage to Alma, the presumption was transferred to the 1944 marriage, if it occurred, so as to require clear and *221 convincing proof of the validity and continued existence of the first marriage if the presumption of the validity of the common-law marriage is to be overcome. The presumption attending the common-law marriage would, of course, have no application were there proof that Alma's husband was alive and the first marriage subsisting in July 1944.
Where, as here, there were no witnesses to the common-law marriage some other mode of proof becomes necessary to show that the parties intended to enter into such a relation. The doctrine of habit and repute ordinarily supplies such proof, but each case must be resolved on its particular facts. As noted, the record clearly establishes that plaintiff and decedent held themselves out as husband and wife in Jersey City prior to 1944, when the alleged common-law marriage took place, as well as subsequent thereto. Our attention must therefore turn to the question of whether plaintiff is to be believed when she testified as to the exchange of vows, in words of present intention to be man and wife, in the Atlanta railroad station and again in the Jacksonville station or streets. The trial judge said he did not believe, and the proofs in the case did not convince him, that the parties contracted the common-law marriage testified to by plaintiff. He noted that the claim was predicated on her word alone, and came very late  not only after the death of the one person who might establish or deny the fact, but for the first time in the second amended complaint. He characterized plaintiff's claim as having "all of the earmarks of an after-thought." He remarked upon the fact that the alleged contract was twice entered into, in Georgia and again in Florida, as well as on plaintiff's knowledge of the existence of Sarah Amaker, and the strange fact that although decedent had taken plaintiff South to avoid news of the marriage reaching Sarah, he nonetheless staged a reception upon his return to Jersey City and introduced her as his wife.
The trial judge concluded, "I am convinced as I can be of anything that there wasn't any marriage in Florida or Georgia as contended by her. I find that claim totally *222 incapable of belief." We cannot say that his conclusion was unreasonable or arbitrary in the light of the entire record.
Plaintiff claims that the trial court's use of the allegations in her original and first amended complaint as disproof of the common-law marriage was improper and unwarranted. Her counsel made no objection when defendant's attorney cross-examined plaintiff as to these allegations. If there was formal error, it was waived. Be that as it may, such admissions in pleadings are, by the great weight of authority, admissible in evidence against the pleader. McCormack, Evidence, § 242, pp. 508, 510 (1954); 20 Am. Jur., Evidence, § 631, p. 534 (1939); 41 Am. Jur., Pleading, § 202, p. 436 (1942); 31 C.J.S. Evidence § 304, p. 1079 (1942); New Amsterdam Casualty Co. v. Popovich, 18 N.J. 218, 224 (1955); Rheinfort v. Abel, 76 N.J. Eq. 485, 487 (Ch. 1909). The admissions in the superseded complaints were patently inconsistent with those in the second amended complaint. They were relevant in attacking credibility and material to the issue of marriage.
In reviewing the entire record, we not only take note of some of the matters the trial court specially commented on, but add thereto the fact that plaintiff's relations with decedent had been meretricious for some time preceding July 1944. All these factors strongly affected the credibility to be accorded plaintiff's proofs.
The mutual consent presently to become man and wife, which the law requires as one of the two essentials to a common-law marriage, is a consent that must not only be unconditional but of matrimonial character. Consent of competent parties to concubinage does not constitute marriage. 10 N.J. Practice (Herr, Marriage, Divorce and Separation), § 39, p. 45 (1950). Reverting to the proof that plaintiff knew of the existence of Mrs. Amaker at the very moment of the exchange of vows in Atlanta (and it is of no moment here that decedent's marriage to Sarah Amaker was later revealed to be without standing; for all plaintiff knew, that marriage was valid), plaintiff could not then have had the necessary intent to contract *223 a relation matrimonial in character and legal in quality, always assuming that what she testified to actually occurred in Atlanta and Jacksonville. What she was in fact consenting to was a position of concubinage, a status which was nothing more or less than the one she had chosen to enjoy for some three years preceding. Such a meretricious relationship will be presumed to continue until satisfactory proof of a change to a matrimonial union is shown. There must be a fresh contract of marriage, Haley v. Goodheart, 58 N.J. Eq. 368 (Ch. 1899), affirmed 72 N.J. Eq. 953 (E. & A. 1901); Miller v. Miller, 14 N.J. Super. 501 (Ch. Div. 1951), necessarily ceremonial under our law. N.J.S.A. 37:1-10. We have no such evidence in this case.
But all this aside, plaintiff's admitted knowledge of Mrs. Amaker and her failure to request a ceremonial marriage after she learned of her death, would properly call for the invocation of the doctrine of unclean hands, in itself fatal to her demand for affirmative relief by way of an action for declaratory judgment. Untermann v. Untermann, 35 N.J. Super. 367, 373 (App. Div. 1955), modified (but affirming application of that doctrine) 19 N.J. 507 (1955).
The basic issue here is the credibility to be accorded plaintiff's testimony as to how the common-law marriage took place. Her proof does not have inherent stability and reliability. Her credibility was strongly affected by numerous contradictions and inconsistencies in her testimony. As trier of the facts, the Chancery Division judge had the opportunity of observing the witnesses and assessing their credibility, particularly so plaintiff's. The court was not bound to believe, nor did it believe her testimony. It did not have a credible quality. In re Perrone, 5 N.J. 514, 521, 522 (1950); Spagnuolo v. Bonnett, 16 N.J. 546, 554-555 (1954). Plaintiff's reliance upon the expressions of decedent's relatives in addressing her as "daughter," "aunt," etc., establishes no more than that the parties held themselves out as husband and wife and were politely so *224 treated by them. We must give due regard to the trial court's opportunity to judge of credibility. R.R. 1:5-4(b).
Defendants argue that plaintiff's alleged common-law marriage should not be recognized in any event, because she and decedent were domiciled in New Jersey and therefore could not go out of the State, enter into a common-law marriage in Georgia or Florida, and then return to their home here and thereafter seek recognition of the marriage in the courts of New Jersey, citing In re Vetas' Estate, 110 Utah 187, 170 P.2d 183 (Sup. Ct. 1946), and Peirce v. Peirce, 379 Ill. 185, 39 N.E.2d 990 (Sup. Ct. 1942). Although we are of the opinion that the strong public policy evinced by the enactment of the 1939 statute, N.J.S.A. 37:1-10, is best effectuated by declaring that persons domiciled in New Jersey cannot leave this State, enter into a common-law marriage in a state where such marriages are allowed, and then return home and ask our courts to recognize that marriage, we do not find it necessary to decide the point in light of our decision on the facts.
Affirmed.