**Jane J. LAIKOLA, a.k.a. Jane J. Kokesh, Widow of Gerald Laikola, Deceased Employee, Jane Laikola, as Mother and Natural Guardian of Andrea Laikola, a Minor, petitioner, Relator,**

**and**

**Laurel Laikola, Widow of Gerald Laikola, Deceased Employee, Respondent,**

**v.**

**ENGINEERED CONCRETE, Employer,**

**American Universal, Insurer.**

**No. 48566.**

Supreme Court of Minnesota.

March 23, 1979.

Chadwick, Johnson & Bridell and John R. Bridell, Minneapolis, for relator.

Samuel Wertheimer, St. Paul, for respondent.

Heard before PETERSON, TODD, and STONE, JJ., and considered and decided by the court en banc.

TODD, Justice.

Gerald Laikola was killed in an industrial accident. At the time of his death, he was ceremoniously married to Laurel Laikola, who was awarded the widow's share of the compensation award. Jane Laikola contests the award to Laurel Laikola on the grounds that she was the common-law wife of Gerald, that their common-law marriage was valid under the law of Minnesota, and that the subsequent ceremonial marriage by Gerald to Laurel in Minnesota was bigamous and void. We affirm the award of the widow's benefits to Laurel Laikola.

In 1964, Gerald Laikola and Jane Kokesh began dating while they were in the process of obtaining divorces from previous spouses. Gerald gave Jane an engagement ring in October 1964. At first they lived together in Minnesota, but in March 1965, they moved to California with Chris, her son by the previous marriage. Jane was also pregnant.

They remained in California during a major portion of 1965. While they were in California, they exchanged wedding bands and held themselves out as husband and wife. Jane testified that she assumed they had effected a common-law marriage in California. However, in 1965, California law did not permit common-law marriages. Their daughter, Andrea, was born in California and the hospital birth records named the parents as Jane and Gerald Laikola and their daughter as Andrea Laikola.

Just before Christmas of 1965, they moved back to Minnesota. In Minnesota they continued to hold themselves out as husband and wife, and many of Jane's transactions with others were conducted as Gerald's wife in the name of Jane Laikola.

Through a business friend, they visited Montana in 1967 for 3 weeks, looking at property for the purpose of living in Montana. While visiting Montana, they held themselves out as husband and wife to at least five persons: their business friend, another businessman, the sister and mother of the businessman, and the proprietor of a stereo shop. Gerald also purchased a Montana family fishing license. Jane testified that as a sign of their affection for each other, they had exchanged polished agates while in Montana. She also testified that they never worked in Montana, they never filed a Montana income tax return, and she never considered herself a resident of Montana. At this time, Montana law permitted common-law marriages under certain circumstances. After the 3 weeks in Montana, they returned to Minnesota. Although they put $200 down on the Montana property, they never moved to Montana because Gerald found a good job in Minnesota.

From 1967 until 1974, Gerald and Jane resided in Minnesota and continued to hold themselves out as husband and wife. In 1974, domestic trouble intensified and culminated in separations lasting 3 or 4 days. In 1975, their relationship deteriorated and each removed their wedding bands. In 1975, Gerald began dating Laurel, and soon thereafter they met with a clergyman to discuss marriage and Gerald's previous cohabitation with Jane. After obtaining a marriage license, Laurel and Gerald were married ceremoniously on October 11, 1975.

On April 21, 1976, Gerald was killed in the course of employment. Both Laurel and Jane claim benefits as the wife of Gerald. Laurel bases her claim on the ceremonial marriage, and Jane bases her claim on a common-law marriage consummated in Montana. The referee refused to recognize the common-law marriage of Gerald and Jane and awarded the widow's share of the workmen's compensation death benefits to Laurel. The referee's decision was unanimously affirmed by the Workers' Compensation Court of Appeals.

The issue presented is whether Minnesota residents who are cohabitating may achieve the status of a valid common-law marriage during a visit for a short time in a state which allows common-law marriages.

Many courts have indicated that they will recognize common-law marriages consummated in another state, even though such marriages cannot be consummated in the forum state. *Mission Ins. Co. v. Industrial Comm'n*, 114 Ariz. 170, 559 P.2d 1085 (1976); *Jennings v. Jennings*, 20 Md.App. 369, 315 A.2d 816 (1974); *Gallegos v. Wilkerson*, 79 N.M. 549, 445 P.2d 970 (1968). Many of these decisions, however, involve a situation where the common-law marriage was consummated while the parties were residents of the common-law state rather than residents of the forum state. Only a few courts have actually held that residents of a state, which prohibits common-law marriages, may temporarily leave the state without taking up a new residence and consummate a common-law marriage elsewhere. See, *Lieblein v. Charles Chips, Inc.*, 32 A.D.2d 1016, 301 N.Y.S.2d 743 (1969), affirmed 28 N.Y.2d 869, 322 N.Y.S.2d 258, 271 N.E.2d 234 (1971).

On the other hand, a few courts have indicated they will not recognize common-law marriages consummated while residents temporarily leave the state, where the law of the state invalidates common-law marriages. See, *Metropolitan Life Ins. Co. v. Chase*, 294 F.2d 500, 503 (3 Cir. 1961) (applying New Jersey law); *Peirce v. Peirce*, 379 Ill. 185, 39 N.E.2d 990 (1942); *Winn v. Wiggins*, 47 N.J.Super. 215, 135 A.2d 673 (1957). This is especially true if there is a state statute which expressly invalidates common-law marriages entered into by residents while living temporarily in another state. *In re Vetas' Estate*, 110 Utah 187, 170 P.2d 183 (1946); *In re Van Schaick's Estate*, 256 Wis. 214, 40 N.W.2d 588 (1949).

Minn.St. 517.01 provides that only common-law marriages contracted in Minnesota prior to April 26, 1941, are valid. However, this court has also adopted the following rule:

"The validity of a marriage normally is determined by the law of the place where the marriage is contracted. If valid by

that law the marriage is valid everywhere unless it violates a strong public policy of the domicile of the parties." *In re Estate of Kinkead*, 239 Minn. 27, 30, 57 N.W.2d 628, 631 (1953).

In *Larsen v. Erickson*, 222 Minn. 363, 24 N.W.2d 711 (1946), we also stated that each state has the exclusive right to determine the marital status of its residents and domiciliaries. Jane and Gerald were domiciliaries and residents of Minnesota at the time they visited Montana. Thus, even if the parties entered into a Montana common-law marriage, it will not be recognized by this court if such marriage violates a strong public policy of the state.

Two Minnesota cases have addressed the issue of whether an out-of-state marriage by Minnesota residents violates a strong Minnesota public policy. In the case of *In re Estate of Kinkead, supra*, this court addressed the issue of whether an Iowa marriage of two Minnesota residents was invalid because it contravened a Minnesota statute that prohibits a new marriage within 6 months after a divorce. This court held the Iowa marriage valid, stating (239 Minn. 34, 57 N.W.2d 633):

" * * * In the absence of a statute expressly declaring a marriage in violation of the six months' provision of § 517.03 void, such marriage not having been declared invalid in a proceeding instituted for that purpose, cannot be collaterally attacked in proceedings to probate a will."

More recently, in *Bogen v. Bogen*, 261 N.W.2d 606 (Minn.1977), this court held that a Nebraska marriage of two Minnesota residents, made in contravention to the same 6-month prohibition, was valid because a strong Minnesota public policy was not violated. This court said, in a footnote (261 N.W.2d 609, n. 4):

"It is to be noted that Minn.St. 517.03 does not expressly declare a marriage in violation of its provisions *void*, as does § 518.01 relating to certain other prohibited marriages."

The obvious implication from these cases is that marriages declared void by the Minnesota Legislature demonstrate a strong public policy. Therefore, out-of-state marriages by Minnesota residents that would be void under Minnesota law should not be recognized by the Minnesota court.

█ Common-law marriages in Minnesota are void, not merely prohibited. Minn.St. 517.01 states in part:

" * * * Lawful marriage may be contracted only when a license has been obtained as provided by law and when the marriage is contracted in the presence of two witnesses and solemnized by one authorized, or whom one or both of the parties in good faith believe to be authorized, so to do. Marriages subsequent to April 26, 1941, not so contracted *shall be null and void*." (Italics supplied.)

█ Because of this provision making common-law marriages null and void, we hold that Minnesota residents may not enter into a valid common-law marriage by temporarily visiting a state which allows common-law marriages.

█ This conclusion is consistent with the elements of a common-law marriage. The frequently recognized elements of a common-law marriage are: (1) Competency to enter into a marriage, (2) a present, mutual consent to assume the marital relationship, and (3) cohabitation and reputation in a community as husband and wife. *Miller v. Townsend Lumber Co.*, 152 Mont. 210, 448 P.2d 148 (1968); H. Clark, Law of Domestic Relations, pp. 47, 48. As the following discussion indicates, it is relatively clear that Jane and Gerald did not satisfy the third element of cohabitation and reputation, even assuming that we would recognize a Montana common-law marriage entered into by Minnesota residents.

Several Montana cases indicate that a short period of cohabitation and holding out as husband and wife is insufficient to establish the reputation required by the third element. In *Miller v. Sutherland*, 131 Mont. 175, 309 P.2d 322 (1957), the appellant and respondent allegedly agreed to be husband and wife. They lived at the same ranch for more than a decade, usually in separate

bedrooms. However, the evidence indicated that they held themselves out as husband and wife only when registering at hotels or lodges, when giving greeting cards, and in executing mutual wills. The Montana court held this evidence was insufficient to establish the necessary repute, stating (131 Mont. 184, 309 P.2d 328):

> "When we speak of repute we mean reputation, being the character and status commonly ascribed to one's actions by the public. The evidence in this case falls far short of establishing a reputation by appellant and respondent as being wife and husband. Instances of cohabitation and registration for living quarters in communities away from the home abode of the parties, of which the record is replete herein, can support the conclusion of meretricious relations as easily as any other."

In another Montana case, *Miller v. Townsend Lumber Co., supra,* an alleged common-law wife of the deceased had cohabitated with him off and on for several months. Eleven days before the death of the decedent, they had taken up residence at a motel in Montana. The parties, on several occasions during the preceding months, had held each other out as husband and wife. Occasionally, they did not. The Montana court held the evidence was not nearly sufficient to establish a reputation that they were husband and wife.

Generally, cases from other jurisdictions also support the conclusion that a common-law marriage cannot be created during a short trip by nonresidents to a state recognizing common-law marriages. In the Illinois case of *In re Estate of Stahl,* 13 Ill. App.3d 680, 301 N.E.2d 82 (1973), the court held that a couple's 3-day vacation in Texas did not establish a Texas common-law marriage because the brief visit was insufficient to create the reputation as husband and wife. Accord, *In re Enoch's Estate,* 52 Ill.App.2d 39, 201 N.E.2d 682 (1964).

In the case of *In re Binger's Estate,* 158 Neb. 444, 63 N.W.2d 784 (1954), a couple residing and cohabitating in Nebraska had taken three pleasure trips to Colorado for a period of 3 or 4 days each, during which time they continued to hold themselves out as husband and wife to friends and relatives. The Nebraska court held these trips were insufficient to create a Colorado common-law marriage.

The Oregon court in *Walker v. Hildenbrand,* 243 Or. 117, 410 P.2d 244 (1966), held that a couple, living together as husband and wife in Oregon and Washington from 1955 until 1964, did not have an Idaho common-law marriage where they had been in Idaho only four times on 3- to 7-day fishing trips, even though they held themselves out as husband and wife on the fishing trips.

In *Andrews v. Signal Auto Parts, Inc.,* 492 S.W.2d 222 (Tenn.1973), a couple cohabitating in Tennessee as husband and wife took a 3-week trip to Alabama, where they were introduced to friends and relatives as husband and wife. The Tennessee court held an Alabama common-law marriage had not been created because of insufficient public reputation in Alabama as husband and wife.

In *State ex rel. Smith v. Superior Court,* 23 Wash.2d 357, 366, 161 P.2d 188, 192 (1945), the Washington court held a common-law marriage had not been created in Idaho, stating:

> " * * * [W]here parties cohabit illicitly in the state of their residence and who happen to temporarily sojourn—only a few days in the case at bar—in a state where common-law marriage is recognized, even if during those few days they hold themselves out as man and wife, those parties cannot by that conduct alone become legally man and wife."

Finally, in the leading case of *Kennedy v. Damron,* 268 S.W.2d 22 (Ky.Ct.App.1954), the Kentucky court held that occasional visits to Ohio of several weeks' duration were insufficient to create an Ohio common-law marriage, even though the couple lived together for more than 9 years as husband and wife in Kentucky. The Kentucky court said (268 S.W.2d 24):

> "The relation of husband and wife is inseparably identified with the home. We think that if the relation is to be

presumed from conduct and reputation, it must be in identification with an established home. * * * We do not intend to say that there must be a legal domicile in the common-law state, in the sense of residence with intent to remain permanently, but we are of the opinion that there must be an established place of abode with which the parties may be identified as members of the community.

"Upon the evidence in the case before us, the chancellor was justified in concluding that Mr. Damron and Eula Mae were merely visitors in Ohio, with no abode by which they established themselves as members of the community. It is true that they occupied a dwelling for a time, but only in the character of transients, and their holding themselves out as man and wife, in Ohio, was principally as to tradesmen with whom they had casual dealings. They did not become an established part of the community."

Accord, *Vaughn v. Hufnagel*, 473 S.W.2d 124 (Ky.Ct.App.1971) (24-hour motel visit insufficient), certiorari denied, 405 U.S. 1041, 92 S.Ct. 1313, 31 L.Ed.2d 582 (1972).

The general common-law rule, therefore, is that the cohabitation and holding out as husband and wife must be of sufficient duration in the common-law state to create a public reputation of husband and wife.[1] To be consistent with this element of a common-law marriage, and to protect the Minnesota public policy which declares common-law marriages among its citizens void, we adopt the following rule:

Common-law marriage, allegedly consummated after April 26, 1941, while the parties are Minnesota residents, will not be recognized. However, the court will recognize a common-law marriage if the couple takes up residence (but not necessarily domicile) in another state that allows common-law marriages, and the parties thereby establish the public reputation in that state of having assumed the marital relationship, as well as the other elements of a common-law marriage.

The facts of this case preclude Jane from seeking to establish a common-law marriage under Montana law pursuant to the rule we have adopted because, as a matter of law, she and Gerald did not take up residence of a sufficient nature or duration in Montana.

Affirmed.

---

1. Only a few courts, such as New York, have been willing to recognize a common-law marriage entered into by residents during a short trip to another state which recognizes common-law marriages. *In re Estate of Pecorino*, 64 A.D.2d 711, 407 N.Y.S.2d 550 (1978) (3-day stay in Pennsylvania sufficient for common-law marriage).