RAMSEY COUNTY and State of
Wisconsin on behalf of Yer
Yang, Appellants,

v.

YEE LEE, Respondent.

No. A08–1991.

Court of Appeals of Minnesota.

Aug. 18, 2009.

Susan Gaertner, Ramsey County Attorney, Kathleen A. Gora, Elizabeth C. Henry, Assistant County Attorneys, St. Paul, MN, for appellants.

Sia Lo, Lo and Associates, St. Paul, MN, for respondent.

Considered and decided by CONNOLLY, Presiding Judge; PETERSON, Judge; and JOHNSON, Judge.

## OPINION

PETERSON, Judge.

In this action to establish child-support under Minn.Stat. § 256.87 (2008), appellant county argues that (1) the district court abused its discretion when it failed to recognize that a Hmong cultural adoption that occurred in Thailand is a legally valid adoption; and (2) even if the adoption in Thailand is not legally valid, the district court erred by failing to extend the doctrine of equitable adoption to this case, and this court should extend the doctrine to this child-support case to protect the child's right to support. Because appellant did not prove that the adoption is valid under the law of Thailand and we decline to extend the application of the doctrine of equitable adoption to circumstances under which it has not previously been applied, we affirm.

## FACTS

Appellant Yer Yang and respondent Yee Lee are Hmong refugees who fled from Laos and lived in a refugee camp in Thailand. They were married in 1993. In July 1999, Yang and Lee took in an infant, Y.P.L., who had been in the care of his grandmother because his mother had died.[1] They obtained a birth certificate from Thai government officials. According to Yang, Lee obtained the birth certifi-

cate and Yang was not aware of what Lee told officials, but Yang explained that when a child is born in Thailand, the parents go to the Thai government and let them know that the child is theirs, and a certificate that is like a birth certificate in the United States is issued. Lee claimed that he was not aware of the birth certificate. The birth certificate is written in the Thai language, which Lee can read but Yang cannot. The birth certificate lists "Mee Yang" as the mother and "Yer Lee" as the father, which Yang claims were false names used to avoid arrest by Thai authorities.

There is no dispute that the ceremonies conducted to bring Y.P.L. into Yang's and Lee's family as an adopted child were appropriate within the Hmong culture. According to Yang, the decision to adopt was mutual. Lee claims that he did not agree with the adoption, that Yang paid for the adoption ceremonies by herself, and that he "wasn't happy about it."

On June 29, 2002, Yang and Lee obtained a divorce according to Hmong cultural practices. A divorce decree was issued, which was signed by elders who were members of Lee's family. The divorce decree states that Lee failed to assist Yang with daily household chores and activities. Neither the adoption nor the divorce was ever registered with Thai authorities. Nothing in the record demonstrates that the Thai government was aware of the marriage, the adoption, or the divorce.[2]

After the divorce, Lee maintained contact with Y.P.L. while still in Thailand. According to Yang, Y.P.L. cried because he missed his father and would walk to

---

1. The record does not include any information about Y.P.L.'s biological father.

2. Neither party cites anything in the record, and we have found nothing other than Lee's

testimony, that indicates what is required under the law of Thailand to effect a marriage, an adoption, or a divorce.

Lee's house, sometimes staying there for an entire day. Lee remarried and adopted his new wife's two children. He came to the United States in 2004 and settled in Ramsey County. Yang came to the United States with Y.P.L in 2005 and settled in Eau Claire, Wisconsin. Since Yang and Lee have been in the United States, Lee has not attempted to contact Y.P.L.

Yang filed for public assistance provided under Title IV–D of the Social Security Act. Wisconsin requested that Minnesota obtain an order setting ongoing child support from Lee, and appellant Ramsey County filed an action to establish child support under Minn.Stat. § 256.87 (2008) and chapter 518C (2008), the Uniform Interstate Family Support Act. The complaint alleged that Lee is the parent of Y.P.L. and owes a duty to support him. Lee filed a request for a hearing on the grounds that he "disagree[d] with the child support amount."

A child support magistrate (CSM) ordered briefing and held a hearing to determine the effect of the cultural marriage, adoption, and divorce on the duty of Lee to support Y.P.L. and the effect of the birth certificate on his duty to support. At the hearing, Yang testified regarding the adoption, Yang's and Lee's marriage and divorce, and the parent-child relationship that developed between Lee and Y.P.L.

Steven Thao, a Hmong elder and expert on Hmong culture, testified regarding the culture of Hmong refugees in Thailand. Thao testified that, in Hmong culture, a woman would not be able to adopt a child without her husband's consent and that it was common for Hmong refugees in Thailand to use false names to avoid arrest by Thai officials. Thao also testified that in Hmong culture, if the husband is at fault in a divorce, everything, including the children, goes to the wife. Thao testified that he was not familiar with Thai law because Hmong refugees were governed by their own laws, not the laws of Thailand.

Lee testified that he had never seen the birth certificate and pointed out that it listed the father as "Yer Lee" not "Yee Lee." Lee testified that he can read Thai and the document appeared to be official and contained signatures from Thai authorities. He also testified that, in order to adopt a child in Thailand, it is necessary to secure the appropriate document and follow a set of Thai legal procedures. He acknowledged that a Hmong cultural adoption took place but claimed that he did not agree and that Yang took care of all of the expenses for the adoption and rituals.

The CSM filed findings of fact, conclusions of law, and an order requiring Lee to pay ongoing child support and granting Yang a judgment for past child support due in 2007 and 2008. In an attached memorandum, the CSM found "that a parent-child relationship was established that is sufficient to create a duty to support the child." The CSM stated that its determination "is not governed by statute, nor is there a well defined body of case law that mandates the outcome." Instead, the CSM concluded that the duty to support was arrived at from the facts and a desire to promote the well-being of Y.P.L.

Lee sought review by the district court, and the district court concluded that "there is no legal avenue available to obligate [Lee] to pay child support. The cultural adoption is not recognized and any other legal doctrine that would impute legal adoption has never been extended to child support cases." Accordingly, the district court ordered that Lee need not pay child support as ordered by the CSM. This appeal followed.

### ISSUES

1. Did appellant prove that the adoption of Y.P.L. in Thailand is legally valid

and, therefore, created a parent-child relationship and a duty of support under Minn. Stat. § 256.87 (2008)?

2. Does Lee owe Y.P.L. a duty of support under the doctrine of equitable adoption?

## ANALYSIS

A Minnesota human-services statute provides, "A parent of a child is liable for the amount of public assistance ... furnished to and for the benefit of the child, including any assistance furnished for the benefit of the caretaker of the child, which the parent has had the ability to pay." Minn.Stat. § 256.87, subd. 1 (2008). A parent who is found able to reimburse the county for public assistance furnished for a child may also be ordered to make continuing support contributions. *Id.*, subd. 1a (2008). The county has the burden of proving its reimbursement claim by a preponderance of the evidence. *County of Anoka ex rel. Hassan v. Roba*, 690 N.W.2d 322, 325 (Minn.App.2004).

In an appeal from a final order under Minn.Stat. § 256.87, this court's review "is limited to determining whether the evidence supports the findings of fact and whether the findings support the conclusions of law and judgment." *Id.* at 324; *see also Ludwigson v. Ludwigson*, 642 N.W.2d 441, 445–46 (Minn.App.2002) (standards for reviewing a district court decision and a child support magistrate's decision are the same). We will not reverse a decision under Minn.Stat. § 256.87 absent an abuse of discretion. *Ver Kuilen v. Ver Kuilen*, 578 N.W.2d 790, 792 (Minn.App. 1998). An abuse of discretion occurs if the district court improperly applies the law to the facts. *Id.*

### I.

"The parent and child relationship between a child and ... an adoptive parent may be established by proof of adoption." Minn.Stat. § 257.54(c) (2008). Proving that an adoption occurred in a foreign country is relatively straightforward when there is a decree from a foreign court. "The general rule is that things done in one sovereignty in pursuance of the laws of that sovereignty are regarded as valid and binding everywhere." 16 Am. Jr.2d *Conflict of Laws* § 9, at 21 (1998). Consequently, "a foreign country's judicial adoption decree will be recognized by United States courts as producing a legal adoption, subject to the condition that the foreign decree not be repugnant to the laws of the state." 2 Am.Jur.2d *Adoption* § 37 (2004).

In this case, however, there is no adoption decree from a foreign country because the adoption procedure that was followed did not produce a decree. Appellants do not cite, and we have not found, any authority that requires an adoption decree in all instances to establish proof of adoption, but there must be proof that the applicable requirements for a valid adoption in the foreign jurisdiction have been met. The general rule is that

> [i]f under the law of the place having jurisdiction there has been a valid adoption, the status arising from that adoption will be recognized elsewhere, provided the status is not contrary to positive law and public policy of the place where its recognition is sought.... On the other hand, if under the law governing an attempted adoption, the adoption is invalid because of failure to comply with the provision of the law, no status is created which will be recognized elsewhere.

15A C.J.S. *Conflict of Laws* § 57 (2002).

Minnesota caselaw is consistent with the principle that a Minnesota court will recognize a foreign adoption as valid if

the adoption was valid under the laws of the jurisdiction where it took place. In the context of a marriage contracted in another state, the Minnesota Supreme Court has adopted the following rule: " 'The validity of a marriage normally is determined by the law of the place where the marriage is contracted. If valid by that law the marriage is valid everywhere unless it violates a strong public policy of the domicile of the parties.' " *Laikola v. Engineered Concrete*, 277 N.W.2d 653, 655–56 (Minn.1979) (quoting *In re Estate of Kinkead*, 239 Minn. 27, 30, 57 N.W.2d 628, 631 (1953)). This court applied this rule in a case involving a marriage contracted in another country in which a husband argued that his marriage, which he entered into in the People's Republic of China, could not be dissolved by a Minnesota court order because it was not a valid marriage. *Ma v. Ma*, 483 N.W.2d 732, 734 (Minn.App.1992). This court determined that because evidence of the marriage had been shown, there was a strong presumption of its legality under Minnesota law. *Id.* at 735. This court held that because the husband "presented no evidence of the requirements for a valid marriage under Chinese law or that the marriage was not contracted legally in China," he "failed to meet his burden of proof to rebut the presumption of a valid marriage," and, therefore, the district court properly recognized the marriage. *Id.*

Minnesota courts have also recognized the validity of an adoption in a foreign country, even though there was no adoption decree. In *Patrick v. N. City Nat'l Bank of Duluth (In re Will of Patrick)*, the testator's brother, who lived in Scotland in 1915, agreed to adopt a child. 259 Minn. 193, 194–95, 106 N.W.2d 888, 889 (1960). The brother treated the child as his son but never undertook any formal adoption proceedings. *Id.* at 195, 106 N.W.2d at 889. A dispute arose over whether the son was a "descendent" within the meaning of the testator's will. *Id.* at 194, 106 N.W.2d at 889. The court noted that there was no statutory procedure for adoption in Scotland. *Id.* at 198, 106 N.W.2d at 891–92. But the court then went on to find that

both statute and judicial opinion have recognized the prior existence of a relationship of "de facto adoption." This has also been characterized as "common law adoption" under Scots law. As early as the 19th century, Scotch courts had recognized the right, in certain circumstances, of those who acquired custody of a child by agreement to retain it, and referred to such parents as having "adopted" the child. In the light of all these considerations it appears that some sort of adoption was known to the law in Scotland at the time of the events involved here.

*Id.* at 198–99, 106 N.W.2d at 892 (citations omitted). The court held that because the evidence conclusively proved a de facto adoption recognized in Scotland, it was presumed that the testator intended the son to be included within the meaning of the term "descendant." *Id.* at 199, 106 N.W.2d at 892.

■ These Minnesota cases persuade us that when determining whether an adoption in a foreign country has been proved and there is no adoption decree, a Minnesota court must determine whether the adoption complied with the adoption laws in the country where it occurred. If the adoption met the requirements of the foreign country's law, a Minnesota court should recognize the adoption as valid, provided that the adoption is not repugnant to the laws of Minnesota.

■ Foreign law "is a matter of fact which the courts of this country cannot be presumed to be acquainted with or

to take judicial notice of unless it is pleaded and proved." *Greear v. Paust*, 202 Minn. 633, 636, 279 N.W. 568, 570 (1938).

The existence and the tenor or effect of all· foreign laws may be proved as facts by parol evidence; but, if it appears that the law in question is contained in a written statute or code, the court may, in its discretion, reject any evidence of such law which is not accompanied by a copy thereof.

Minn.Stat. § 599.01 (2008). As a general rule, we will not set aside a district court's findings of fact unless clearly erroneous. *Fletcher v. St. ·Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn.1999).

The county, which bears the burden of proving that Lee adopted Y.P.L., argues that the Hmong cultural adoption was valid under the law of Thailand. But the only evidence of Thai law that the county cites is the Conflict of Laws Act B.E. 2481, which was enacted by the King of Thailand, by and with the consent of the House of Representatives, in 1938.[3] Section 35 of the Conflict of Laws Act states:

If the adopter and the adopted have the same nationality, the adoption shall be governed by their law of nationality.

If the adopter and the adopted have different nationalities, the capacity and conditions for adoption shall be governed by the law of nationality of each party. However, the effects of adoption on the adopter and the adopted shall be governed by the law of nationality of the adopter.

Citing section 35, the county argues that because Yang, Lee, and Y.P.L. are Hmong, they are governed by the laws of the Hmong, and under the laws of the Hmong, the cultural adoption of Y.P.L. was valid. But section 6 of the Conflict of Laws Act states:

Whenever the law of nationality is to govern, and a person has two or more nationalities acquired successively, the law of nationality last acquired shall govern.

Whenever the law of nationality is to govern, and a person has two or more nationalities acquired simultaneously, the law of nationality of the country where such person has his domicile shall govern; if such person has his domicile in a country other than any such country, the law of his domicile at the time of the institution of action shall govern; if the domicile of such person is unknown, the law of the country where he has his residence shall govern.

In any cases of conflict as regards the nationality of a person, where one of the nationalities in conflict is Thai, the law of nationality which shall govern is the law of Siam.

As regards a person who has no nationality, the law of his domicile shall govern; if his domicile is unknown, the law of the country where he has his residence shall govern.

Whenever by application of the law of nationality, the local law, the communal law or the religious law,· as the case may be, is to apply, such law shall govern.

Even if it is true that under the laws of the Hmong, the cultural adoption of Y.P.L. was valid, the county has not shown that the law of the Hmong governs when determining whether the adoption was valid. The record does not demonstrate whether Yang and Lee, who had both lived in at least two countries when the adoption occurred, had only one nationality. It appears that under the Conflict of Laws Act, this is a relevant fact when determining what law governs. And more importantly, the county has not shown that the Conflict

---

3. A copy of this act was introduced at trial and is included in the record.

of Laws Act applies at all to our determination whether the cultural adoption of Y.P.L. satisfied the legal requirements for an adoption in Thailand.

The county's assertion that the law of the Hmong governs is not implausible, but it is not supported by any authority that demonstrates that the county has correctly described the law of Thailand. The county did not offer any expert testimony regarding the legal effect of the Conflict of Laws Act and its application to Hmong living in Thailand, and appellant's expert on Hmong culture testified that he had no knowledge of Thai law regarding adoption. Even if the county is correct that the Conflict of Laws Act applies, the language of the act, on its face, suggests that to determine what law applies, more must be known about the facts of the case than that Yang, Lee, and Y.P.L. are all Hmong. Therefore, because the county has neither produced a foreign country's adoption decree for Y.P.L.'s adoption nor demonstrated that the adoption satisfied the legal requirements for an adoption in Thailand, we conclude that the district court correctly determined that the county did not prove that the cultural adoption is recognized in Thailand as valid.

## II.

Appellants argue that even if the adoption was not valid under the law of Thailand, the district court erred by not extending the doctrine of equitable adoption to this case when Y.P.L. was held out as the couple's son and has no remedy against his natural parents. Appellant argues that Minnesota has recognized the doctrine of equitable adoption in inheritance cases, that other jurisdictions have recognized the doctrine in cultural-adoption cases, and that the unique circumstances of this case justify this court's extending the doctrine to cultural adoptions in child-support cases.

Under certain circumstances in the context of inheritance, Minnesota courts have for many years treated a child as if the child had been adopted even though no adoption had occurred. In *Fiske v. Lawton (In re Herrick's Estate)*, Garafilia Herrick and her husband took a four-year-old girl into their home while living in Ohio. 124 Minn. 85, 86–87, 144 N.W. 455, 456 (1913). At the time, Ohio had no statutory adoption procedures, and no statutory adoption occurred. *Id.* at 87, 144 N.W. at 456. The four-year-old girl ultimately became the appellant's mother. *Id.* When Herrick died, she left a will referring to the appellant as her "granddaughter," but the will was refused probate, and the district court concluded that the appellant was not Herrick's heir and distributed the estate to the respondent. *Id.* The supreme court reversed and described the appellant's inheritance rights in terms of a "contract" under which the appellant was entitled to a share of the estate because the appellant's mother held up her end of the bargain:

> [T]he deceased voluntarily entered into the contract, and pursuant thereto received, during her life, the benefits of the relation thereby created, the services, society, affection, and devotion of an adopted daughter made her own. No principle of law or equity requires a holding that respondent can avail herself of technical objections to the child's status, the validity of which, so far as appears, remained undisputed by deceased, after full performance of the contractual relations therein involved.

*Id.* at 89, 144 N.W.2d at 457. The court held that the contract was "valid where made, and when executed, the deceased dying intestate, it entitled appellant's mother, pursuant to the equitable maxim

that equity regards that as done which ought to be done, to the same share in decedent's estate as a natural child." *Id.* at 90, 144 N.W. at 457.

■ In a later case, the supreme court explained that the general rule in this country

> is that contracts to adopt not performed by effectual adoption proceedings during the life of the adoptive parent will, upon the latter's death, be enforced to the extent of decreeing that the child occupies in equity the status of an adopted child or, at least, is entitled to such right of inheritance from the estate of the adoptive parent as a natural child would enjoy in such cases where the child in question has fully and faithfully performed the duties of a child to the adoptive parent and the circumstances require the relief as a matter of justice and equity.

*Olson v. Olson (In re Estate of Olson)*, 244 Minn. 449, 451–52, 70 N.W.2d 107, 109 (1955). The court explained further:

> When the words "equitable adoption" are used, it is our opinion that the court, under its general equity powers, merely is treating the situation as though the relationship had been created between the one promising to adopt and the beneficiary of that promise. All the rules which define the capacities and incapacities of persons to acquire rights or to be subject to duties are strictly legal. Remedies of establishing or destroying personal status do not belong to the original jurisdiction of chancery and as far as it exists is wholly of statutory origin. In this state the statutes define a procedure to be followed in order to establish an adoption. A person may not become per se adopted unless those procedures have been followed. In our opinion the courts exercising their equity power may in a proper case, . . . treat the parties as though an adoption had been made. It cannot create the status of adoption apart from the statutory procedures.

*Id.* at 454, 70 N.W.2d at 110 (citations omitted).

Appellants do not cite, and we have not found, any Minnesota case that applies the doctrine of equitable adoption in any context other than inheritance. The district court declined to apply the doctrine in this child-support case, and we also decline to extend the application of the doctrine to circumstances under which it has not previously been applied. *See Northfield Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, 545 N.W.2d 57, 62 (Minn.App.1996) ("The Minnesota Supreme Court is the appropriate forum to address a question regarding the extension of existing law." (quotation omitted)), *review denied* (Minn. June 19, 1996); *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn.App.1987) (stating that "the task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court"). Consequently, we will not impose on Lee a duty to support Y.P.L. under the doctrine of equitable adoption.

## DECISION

Because the county did not meet its burden of proving that Lee adopted Y.P.L. under the law of Thailand and because, in Minnesota, the doctrine of equitable adoption has been applied only in inheritance cases, the district court did not err in concluding that Lee need not pay child support as ordered by the CSM.

**Affirmed.**